No. 81,642

STATE OF KANSAS, *Appellee,* v. DEREK L. BEDFORD, *Appellant.*

(7 P.3d 224)

Opinion filed June 2, 2000.

*Randall L. Hodgkinson*, assistant appellate defender, argued the cause, and *Elizabeth Seale Cateforis*, assistant appellate defender, and *Jessica R. Kunen*, chief appellate defender, were on the brief for appellant.

*Sheryl L. Lidtke*, assistant district attorney, argued the cause, and *Nick A. Tomasic*, district attorney, and *Carla J. Stovall*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: Derek L. Bedford was convicted by a jury of premeditated first-degree murder, and the court imposed a hard 40 sentence. Bedford appeals his conviction and sentence, raising the following issues:

1. Did the district court abuse its discretion in denying defendant's request for a continuance of the trial date?

2. Was evidence of a history of domestic violence between the victim and her estranged husband improperly excluded?

3. Did the trial court abuse its discretion in permitting the State to use the preliminary hearing testimony of Kim Withers?

4. Was the prosecutor's remark in closing argument so gross and flagrant as to prejudice the jury against defendant and deny him a fair trial?

5. Was there sufficient evidence from which a rational factfinder could find Bedford guilty beyond a reasonable doubt of premeditated first-degree murder?

6. Was there sufficient evidence of the aggravating circumstance found by the trial court, and, if so, did mitigating circumstances outweigh the aggravating circumstance?

7. Does cumulative trial error require reversal of Bedford's conviction?

The relevant facts are not seriously disputed. Lisa Bradish's body was found in a truck yard in an industrial area of Kansas City, Kansas, at approximately 7:30 on Monday morning, July 8, 1996. Her jeans and underpants were down over her buttocks and upper thighs, her shirt was torn open, and her bra was shifted so that her left breast was exposed. Marks on her body indicated that she had been driven over. She was not wearing shoes, but her feet were clean. Her purse was found lying about 50 feet away from her. It was empty except for a receipt from a retail store.

An autopsy showed that she had been beaten, strangled, and crushed. The pathologist counted 35 different cuts, abrasions, scrapes, and bruises. Her left elbow was fractured and her left shoulder was dislocated. Her spinal column had been broken and separated in her neck between the third and fourth cervical vertebrae. The pathologist described the separation as being "more dramatic than [he] would expect from the usual use of hands." Bradish's hyoid bone, a free-floating bone at the base of the tongue, was fractured by pressure to the front of her neck. There was hemorrhaging in the muscles of her neck and petechia in her eyes, which indicated that she had been strangled. She had multiple rib fractures on her left side and a lacerated liver. In the opinion of the pathologist, Bradish had been beaten and strangled and then subjected to a massive crushing force. He thought it likely that she was dead before the crushing force was applied.

Bradish's blood alcohol concentration was .405, which is five times the level of legal intoxication. Although that degree of intoxication would depress the central nervous system, the pathologist did not believe that the alcohol killed Bradish. The bruise patterns showed that she was alive when those injuries were inflicted. The pathologist concluded that Bradish's death was a homicide.

Lisa Bradish's estranged husband saw her about midday on Sunday, July 7. She was drinking at that time in a bar in Johnson County. By midafternoon she had moved to another Johnson County bar where she met a former acquaintance, Robert Salmon. Early in the evening, with Salmon driving, he and Bradish went to another bar, where they had a couple of drinks. From there they went to the Westport area of Kansas City, Missouri, where they visited three or four different bars. Salmon thought they left Westport about 10 or 11 p.m. Bradish directed him to drive to 30th and Prospect in Kansas City, Missouri, where she got out of the car and walked away. Salmon did not see her again.

Bedford's sister, LaFrances McDaniel, worked at a bar at 29th and Prospect. She remembered Bradish's being in the bar several months earlier and then saw her come in on July 8, shortly after midnight. Bedford arrived at the bar before 1 a.m. McDaniel did not see him talk to Bradish. Shortly before the 3 o'clock closing

time, McDaniel called a cab for Bradish and told her to wait for it outside. Bedford helped McDaniel clean up, and they had a drink together before he left.

At trial Bedford testified that about an hour before closing, Bradish approached him in the bar and asked him for a ride. When he came out of the bar, she told him where she wanted to go and they walked to his car. They had sex in his car before leaving the parking lot. As they drove toward 39th and Rainbow, Bedford testified, Bradish started hitting him and spitting on him. When he pulled over and told her to get out, Bradish kissed him and said that she would stop. Near the KU Medical Center, she started hitting and scratching him again. Bedford testified that he "went someplace" and pulled over. Bedford testified that he tried to grab her hands to keep her from swinging at him, but he was not able to stop her. He picked up something and hit her about four times, then pushed her out of the car when she stopped fighting, and drove off.

In a statement to police, Bedford said that "he felt kind of a bump" as he began to drive away. He also said that he had thrown Bradish's purse out of the car. He also stated that before he threw her out of the car, she had stopped fighting and just "sat there" in his car. Bedford also "confessed" to several friends the day Bradish was killed. He told them he killed "some white girl in KCK," and two of his friends testified that they had seen bloody items in the car.

KBI testing showed blood stains on seat covers from Bedford's car. The DNA profile of the biological fluid from the seat covers matched Bradish's DNA profile.

The resolution of the first issue raised by Bedford depends on how we resolve the second issue. For that reason, the two issues will be discussed together. Bedford contends that in the circumstances of this case the district court's refusal to grant a continuance was an abuse of discretion because it effectively denied Bedford's right to present a defense. The particular circumstances cited by Bedford include that trial counsel was not appointed to represent him until approximately 2½ weeks before trial. Counsel's trial preparation centered on preparing the defense that Mike Bradish, the victim's estranged husband, was likely the killer. On the day

trial was scheduled to begin, the State sought a ruling that would exclude evidence of a history of domestic violence between the victim and Mike Bradish. Defense counsel opposed the motion on the ground that the trial court's granting it would annul the planned defense theory. When the trial court granted the State's motion, defense counsel requested a continuance to give him more time to pursue a defense theory. That request was denied.

In addition, the trial court adhered to its ruling when asked to reconsider it on the ground that Bradish's direct testimony opened the door for evidence about their relationship. Defendant contends that the trial court's rulings resulted in exclusion of evidence concerning a critical issue which was an integral part of the defense theory. He cites *Chambers v. Mississippi,* 410 U.S. 284, 294-95, 35 L. Ed. 2d 297, 93 S. Ct. 1038 (1973), and *State v. Bradley,* 223 Kan. 710, 713, 576 P.2d 647 (1978). For this reason, he urges the court to review this question as a matter of his constitutional right to a fair trial. The State would have the court treat this as a simple evidentiary matter and apply an abuse of discretion standard. We agree with the State and do not find the exclusion of the evidence to be a question of constitutional magnitude.

We considered the same issue in *State v. Bornholdt,* 261 Kan. 644, 932 P.2d 964 (1997), and *State v. Thomas,* 252 Kan. 564, 847 P.2d 1219 (1993). In both cases, the district court excluded circumstantial evidence that someone other than the defendant committed the crime. In *Thomas,* we said:

"Thomas, in framing his 'right to present a defense' claim, asserts that he has been denied his right to due process, to a fair trial, and to compulsory process. Thomas does not present an independent analysis for these four claims. The due process and fair trial arguments are aspects of the right to present a defense. Thomas is correct when he advances the premise that he has a right to present a defense. See *State v. Irons,* 250 Kan. 302, 309, 827 P.2d 722 (1992). However, this right is subject to statutory rules and case law interpretation of rules of evidence and procedure. For example, as the State points out, we have repeatedly held that a trial court can exclude, as irrelevant, circumstantial evidence that someone other than the defendant committed the crime in situations where the State's case is built on direct evidence. [*State v.*] *Jackson,* 244 Kan. [621, 625, 772 P.2d 747 (1989)]. In the case at bar, the State's case was based on direct evidence." 252 Kan. at 573.

In *Bornholdt*, this court stated:

"In *State v. Johnson-Howell*, 255 Kan. 928, 948, 881 P.2d 1288 (1994), we held:
" 'The defendant's right to present a defense is subject to the rules of evidence and the case law. *State v. Thomas*, 252 Kan. 564, 573, 847 P.2d 1219 (1993). The standard of review for a claim of improper exclusion of relevant evidence is whether the trial court abused its discretion in excluding the testimony. *State v. Walker*, 252 Kan. 117, 133, 843 P.2d 203 (1992).'

"In *State v. Peckham*, 255 Kan. 310, 321, 875 P.2d 257 (1994), we said: " 'When the state relies on direct evidence, circumstantial evidence that someone other than the defendant committed the crime charged is irrelevant in the absence of other evidence to connect such third party with the crime." *State v. Calvert*, 211 Kan. 174, Syl. ¶ 3, 505 P.2d 1110 (1973).' " 261 Kan. at 666.

Our holding in both cases was that when the State's case is based on direct evidence, circumstantial evidence that someone other than the defendant committed the crime is not relevant absent evidence to connect the other party with the crime. Here, the State's case is based on direct evidence, including the admissions of the defendant, and there was no evidence to connect Mike to the murder of Lisa. The evidence excluded by the trial court's ruling did not show or even tend to show that Mike killed the victim. The excluded police reports of past violence between Mike and Lisa would have shown the jury that their marriage had been marked by violence, but it would not have shown that there was violence between them on the night she died.

As to the State's opening the door, Mike testified on direct examination about drinking causing problems between him and Lisa. With regard to their history, he testified that after knowing each other for 2 weeks they were married in Las Vegas in December 1994. Approximately 14 months later they separated but continued to see each other. Mike lived with his mother; Lisa lived with her parents. On Sunday, July 7, Mike picked Lisa up at her mother's house about 11 a.m. to go to Denny's restaurant. The night before, he had disabled Lisa's car because he had not wanted her to drive it. Instead of going to Denny's, they went to where her car was parked at Rita's bar so that Mike could replace the part he had removed. Lisa drove her car to Bryce's bar. Mike followed her. She was already inside when he arrived.

Mike testified that he told her he was not going to drink with her, but then he did for awhile. Before leaving at approximately noon and going to Chicago's, another bar, he said to Lisa, " 'I've learned two things out of this relationship . . . I've learned that I finally found—I love somebody, I know what love is now and I've learned one great vocabulary,' because she always called me on my grammar." Mike testified that Lisa responded, " 'Mike, I love you, I love you more than anything in the world.' " Mike testified that he left Bryce's then because drinking was a problem between them and he "couldn't handle the drinking with her."

According to Mike's account, he never saw Lisa again. He continued to drink in bars until closing time, 1:30 a.m. Monday, then went to a friend's house, slept in his car, and finally went home to his mother's about 9 o'clock Monday morning. Lisa died in the early morning hours of Monday, July 8, 1996.

Defense counsel contended that the nature of their relationship had been opened up by the prosecution, that the jury had been given the false impression that it was a "lovely relationship," and that he should be permitted to introduce evidence showing that it was in fact a very violent relationship. Outside the presence of the jury, defense counsel represented to the trial court that evidence of the violent relationship would be relevant to the question of who killed Lisa because "there is a good possibility [Mike] could have been involved in this." The evidence defendant sought to introduce consisted of police reports of incidents of domestic violence between Lisa and Mike Bradish. The proffered reports were marked and made a part of the record at trial, but they are not a part of the record on appeal.

When defense counsel cross-examined Mike, the jury heard him testify that he and Lisa both got "mouthy" when they drank and that he would provoke her into fighting with him. He admitted getting into "a little slight argument" with her at Bryce's on Sunday, July 7. He denied calling her a slut and asking her, " 'Look bitch, how many fucking niggers are you going to fuck tonight?' " He testified, however, that she might have asked him, " 'Are you going to hit me now, are you going to hit me now?' " in order "to get attention." Cross-examination also brought out that Mike's own

testimony placed him in the early morning hours of July 8 in the area where Lisa's body was found.

On appeal, defendant relies on *State v. McClanahan*, 259 Kan. 86, 94, 910 P.2d 193 (1996). In *McClanahan*, however, the "opened door" argument failed. The court acknowledged that in the proper circumstances a party can open the door for otherwise inadmissible evidence.

"However, the State's reasoning that the door had been opened and that it was permitted to refute the defendant's implication that Josephine left the defendant because she was seeing Martin is flawed. At the time the State asked the defendant if Josephine left him because he was beating her, there had been no testimony of what caused the separation or any indication that Josephine left him because she was seeing Martin. Therefore, no door had been opened by the defense for the prosecutor to introduce the inadmissible testimony at that point.

"After the defendant's objection to the prosecutor's question whether Josephine left the defendant because he was beating her was sustained, in answer to the prosecutor's questions the defendant admitted that he wanted the jury to infer that Josephine left him because she was seeing Martin. This testimony, however, was elicited by the prosecutor during his cross-examination of the defendant. While a party can open the door to otherwise inadmissible evidence, that rule applies only when one party opens the door for another party to present such evidence. A party cannot open the door for itself to present the inadmissible evidence. If a door was opened here, it was opened by the prosecutor. The trial court properly sustained the defendant's objections to the prosecutor's questions concerning his prior physical abuse of Josephine. The evidence was inadmissible under the opened door theory." 259 Kan. at 94.

Here, the State did not open the door for the introduction of the proffered evidence. Moreover, even without the police reports of domestic violence, the jury already had the information that Mike and Lisa's marriage was a violent one from properly admitted evidence, including Mike's own testimony. The district court did not err in excluding the evidence.

Bedford next argues that it was error to allow the State to use the preliminary hearing testimony of Kim Withers. Over the objection of defense counsel, Withers was found by the trial judge to be unavailable as a witness at the time of trial. Her preliminary hearing testimony was read to the jury during the State's case.

K.S.A. 60-460(c) provides that preliminary hearing testimony from the same action may be admissible if the judge finds that the

declarant is unavailable as a witness at trial. The statute further provides that the provisions of subsection (c) "shall not apply in criminal actions if it denies to the accused the right to meet the witness face to face." Bedford contends that the State's witness, Withers, was not unavailable within the meaning of the statute. K.S.A. 60-459 defines the phrase "[u]navailable as a witness" as including "situations where the witness is . . . absent from the place of hearing because the proponent of his or her statement does not know and with diligence has been unable to ascertain his or her whereabouts."

On appeal, Bedford concedes that the State made an effort to secure Withers' presence at trial. According to Bedford, a certificate pursuant to the Uniform Act to Compel Attendance of Out-of-State Witnesses was issued on the State's request, but process was never served on Withers. An investigator from the prosecutor's office testified that he began looking for Withers approximately a month before trial. He contacted a woman who he believed was Withers' mother. She refused to give him information about Withers' situation; she arranged a telephone conference call among herself, Withers, and the investigator. The investigator talked briefly with Withers, who refused to say where she was, told him she was not going to testify, and hung up. The investigator talked to Withers' former husband, who denied seeing her for several months. The investigator testified that he had daily contact with investigators in the prosecutor's office in Jackson County, Missouri, for the purpose of locating and serving witnesses. The Missouri investigator who was most active in trying to locate Withers checked with the postal inspector and former employers of Withers and her former husband. These efforts to locate Withers were unsuccessful.

After hearing the testimony of the investigator and arguments of counsel, the trial judge found that the State acted in good faith and exercised due diligence in trying to locate the witness. The trial court further noted that defendant was represented by capable counsel at the time of the preliminary hearing and had the opportunity to cross-examine Withers. The trial court concluded that the requirements for using the witness' preliminary hearing testimony were satisfied. The determination of the trial court will not be

disturbed on appeal absent a showing of an abuse of discretion. *State v. Cook*, 259 Kan. 370, Syl. ¶ 1, 913 P.2d 97 (1996).

Bedford takes issue with the finding of due diligence. He contends that the State could have found Withers if it had applied more pressure on her mother. He does not, however, cite any authority for the proposition that the due diligence requirement is not satisfied until a missing witness' family members are subjected to coercion. Our case law is to the contrary.

In *Cook*, the State kept in contact with its witness, Rudell, through his Topeka attorney, who was contacted on a regular basis by telephone by his client. A week before trial, the witness telephoned the prosecutor and declared that he would not travel to Kansas for Cook's trial unless his travel expenses were paid up front. The money was sent to him, but he did not pick it up. Rudell then became unreachable where he previously had been contacted. The State did not issue a compulsory process on the witness or his attorney, nor did it attempt to secure the witness' presence under the material witness statute. "Rather, the State simply relied upon a gentleman's agreement that Rudell would appear because the district court asked him to do so." 259 Kan. at 376. In these circumstances, the court concluded that the district court had not abused its discretion in finding that the State had exercised due diligence in trying to secure the witness' appearance at trial. 259 Kan. at 383.

The circumstances in the present case are not comparable to those in *Cook*. There, the witness indicated up until the time of trial that he would appear. Here, Withers steadfastly refused to cooperate. In both instances, however, for the purpose of securing the witness' appearance, the State conformed its efforts to its reasonable expectation of the witness' conduct. By doing so, the State acted with due diligence.

We next consider if the prosecutor's remark in closing argument denied Bedford a fair trial. Bedford complains about the italicized sentence from the prosecuting attorney's closing argument:

"Through the course of the last couple days you've learned a little bit about this person Lisa Bradish that was brutally murdered back on July 8th. We know that Lisa was somebody's daughter, she was a sister, she was somebody's wife, she was

a granddaughter to somebody. We know that she was a teacher, we know also that Lisa was a person that didn't have prejudices, that she often socialized with the Hispanic community, with the African American community, and we also know that Lisa Bradish had a drinking problem. And there's been a lot of testimony about that. *I keep thinking about something that [defense counsel] said in his opening statement, that this was a drunk that lived the kind of lifestyle that she deserved what she got.* Nobody deserves to be killed as brutally as Lisa Bradish was."

Defense counsel objected and denied making a statement like that. The trial judge initially addressed his response to the prosecutor and then turned to the jury: "Ms. Lidtke [the prosecutor], I don't believe [defense counsel] said such a thing, but the jury is directed to recall for yourselves what the witnesses have said in this particular case and what the lawyers say is not evidence. You may continue."

The State concedes that defense counsel never actually said the words "Lisa Bradish deserved to die." The State takes the position, however, that the victim's deserving to die was the inference to be drawn from defense counsel's words.

The gist of defense counsel's statement was that there was a pattern to the victim's conduct when she became intoxicated that included seeking intimate contact with strangers and provoking fights, that when she died she was extremely intoxicated, and that she had asked to ride with Bedford and then picked a fight with him. The conclusion that defense counsel suggested should be drawn from the circumstances of Lisa Bradish's death was: "Everybody was a drunk in this situation and it's a terrible thing that happened, but it sure was not a first degree homicide case." Thus, on the whole, defense counsel's statement was not a comment on what the victim deserved. On the whole, the statement was about the victim's conduct affecting the degree of Bedford's criminal culpability. One portion of the statement, however, shifts the focus to the victim's responsibility for her own conduct—"we both feel sorry for what happened to her, but she has to take the consequences for what happened because of her own actions." There is no literal meaning to the statement because the victim is dead and not available "to take the consequences." Hence, what meaning

the statement has must be found in its implication. It was not unreasonable for the prosecuting attorney to infer that defense counsel meant to blame the victim for her own death. This is not necessarily the same as saying she deserved to die, but it would not seem entirely unreasonable to interpret it in a moralistic way to mean that she deserved to die. Thus, it would not seem that the prosecuting attorney's position can be completely discounted. One could reasonably conclude that the prosecuting attorney was repeating what she understood defense counsel to have said.

However, even if the State's interpretation were unreasonable and the remarks improper, the trial court's statement to the jury cured the error. Bedford contends that the trial court should have instructed the jury to disregard the improper comment and the failure to do so created reversible error. He relies principally on *State v. Lockhart*, 24 Kan. App. 2d 488, 947 P.2d 461, *rev. denied* 263 Kan. 889 (1997). In that case the prosecutor told the jury that defendant and defense counsel were liars. Upon objection, "the trial court simply sustained the objection and agreed to 'strike' the comments but did not explain what that meant. The trial court neither instructed the jury to disregard the flagrant comments made by the prosecutor, nor reiterated to the jury that the statements of counsel were not evidence." 24 Kan. App. 2d at 493. As a result, the appellate court was convinced that Lockhart had not received a fair trial.

In the present case, when defense counsel objected, the trial court stated that the jurors should "recall for yourselves what the witnesses have said in this particular case and what the lawyers say is not evidence." Although the trial court expressed the view that the prosecutor misrepresented what defense counsel had said, the court did not instruct the jury to disregard the prosecutor's remark. The trial court, however, did reiterate to the jury that the statements of counsel are not evidence. These circumstances are more favorable to defendant than those in *Lockhart* and do not amount to deprivation of a fair trial.

Bedford next questions the sufficiency of the evidence of premeditation. He argues that there is no evidence that he planned, contrived, and schemed the killing. He directs the court's attention

to its discussion of the element of premeditation in *State v. Sanders*, 258 Kan. 409, 414-15, 904 P.2d 951 (1995). The actual issue in *Sanders* was "not whether there was sufficient evidence of premeditation but whether there was sufficient evidence to require the trial judge to instruct on the lesser included offense of second-degree murder. These are different questions." 258 Kan. at 415. Moreover, the legislature has since changed the statutory definition of premeditated first-degree murder that applied at the time of *Sanders*.

The version of the statute applicable in *Sanders* defined first-degree premeditated murder as "the killing of a person committed maliciously, willfully, deliberately, and with premeditation." K.S.A. 1992 Supp. 21-3401. The current version of K.S.A. 21-3401 provides in part that murder in the first degree is "the killing of a human being committed . . . [i]ntentionally and with premeditation." Accordingly, juries are instructed that in order to establish a charge of murder in the first degree, the State must establish that the defendant intentionally killed the victim and that the killing was done with premeditation. PIK Crim. 3d 56.01. In this case, the trial court also instructed that "[p]remeditation means to have thought over the matter beforehand." The jury was instructed on the lesser offenses of second-degree murder, intentional and unintentional, voluntary manslaughter, involuntary manslaughter, and aggravated battery.

When considering a challenge to the sufficiency of the evidence, this court must review all the evidence, viewed in the light most favorable to the prosecution, and determine whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Johnson*, 266 Kan. 322, 326, 970 P.2d 990 (1998). The State contends that there is ample evidence in this case of premeditation, including the following: Bedford killed Bradish in a dark, isolated spot. He struck her repeatedly on her face and head using his fists and a radio. He strangled her with an extension cord, pulling it so tight that he broke a bone in her neck. He pushed her body out of the car and drove over it. Even viewed in the light most favorable to the State, some of these circumstances are subject to being interpreted to favor Bedford's account

rather than the picture drawn by the prosecutor. For example, the objects wielded by Bedford are utilitarian items not typically used as weapons. It reasonably could be inferred from his use of objects that happened to be at hand that killing the victim was not the result of thought being giving to it beforehand.

There is other evidence, however, that would give rise to a reasonable inference that Bedford thought beforehand about killing the victim. In particular, the evidence that the victim's jeans and underpants were down over her buttocks and upper thighs, her shirt was undone, and her bra was not in place suggests that there may have been sexual contact or attempted sexual contact between the defendant and the victim shortly before she died. In Bedford's account, their only sexual encounter occurred in his car before they left the area of the bar on Prospect in Kansas City, Missouri. Bedford explained their being in the Wyandotte County industrial area, which was quite secluded in the early morning hours, as the result of his following Bradish's directions, and he explained their physical conflict as the result of her provoking him by hitting and spitting on him.

The State directs the court's attention to evidence that Bradish had been driven over after she was lying on the ground outside Bedford's car and contends that the court has recognized that premeditation may be inferred from a defendant's continuing to inflict blows after the victim has been rendered helpless. *State v. Phillips,* 252 Kan. 937, 940, 850 P.2d 877 (1993); *State v. Henson,* 221 Kan. 635, Syl. ¶ 1, 562 P.2d 51 (1977). At the time of each of the cited cases, the statute required deliberation and premeditation. The two were considered together in both instances. The parties have not directed our attention to any opinions of this court in which premeditation only has been inferred from a defendant's brutality continuing after the victim was rendered helpless.

The victim's state of partial undress, the isolated location, and the brutality and repeated blows of the attack on her as well as driving over her body run counter to Bedford's account and tend, instead, to support a determination that he thought about killing Bradish beforehand. Premeditation is a matter of thinking of killing the victim before doing so, but not necessarily a matter of long-

range planning. *State v. Rice*, 261 Kan. 567, 587, 932 P.2d 981 (1997). There was sufficient evidence from which a rational fact-finder could have found that the killing was premeditated.

As to his hard 40 sentence, Bedford argues there was not sufficient evidence of the aggravating circumstance and, if there was, the mitigating circumstances outweighed the aggravating circumstance. The trial court found that Bedford killed Bradish in an especially cruel, heinous, or atrocious manner. The trial court made the following observations about the evidence:

"The reason I am finding that primarily is because the—there was obviously a beating involved in this case. It may have been very brief, but there was clearly a substantial infliction of bodily harm on this young lady before she was killed.

"The Court is further finding that—and this is primarily where I'm hanging my hat in this particular case is the fact that there was strangulation in this particular case. The Court believes that there is probably some reason to believe that a fight probably took place between these two individuals in this car before the killing took place. . . .

"The Court is taking into account the fact that the young lady involved in this case was not a very large person and the Court is taking into account the fact that she was obviously very intoxicated. I've only seen one other case in my entire career where somebody was above .40 in terms of alcohol, and I think obviously somebody in that situation that is that impaired and a woman of her size would clearly not be a threat to anyone and certainly not a threat to someone of Mr. Bedford's size.

"And so I find that because there was the beating, because there was the strangulation that this was an especially heinous, atrocious and cruel manner type of killing."

The trial court also found several mitigating circumstances—no significant criminal history, Bedford was 22 years old, and the victim probably was a "participant in the defendant's conduct to some fashion."

The trial court further found that the mitigating circumstances did not outweigh the aggravating circumstance. The hard 40 sentence was imposed on Bedford.

On appeal, defendant first challenges the sufficiency of the evidence for establishing the aggravating circumstance of an especially heinous, atrocious, or cruel manner of killing. "Where the sufficiency of the evidence for establishing an aggravating circumstance under K.S.A. 21-4636 is challenged, the standard of review

is whether, after a review of all the evidence, viewed in the light most favorable to the State, a rational factfinder could have found by a preponderance of the evidence the existence of the aggravating circumstance." *State v. Spain*, 263 Kan. 708, Syl. ¶ 6, 953 P.2d 1004 (1998).

Bedford contends that the cause of Bradish's death very likely was strangulation and that strangulation would be no more horrible than death by shooting or stabbing. In this regard, Bedford would have the court ignore the pathologist's testimony that he could not state with certainly what caused her death. She had suffered severe beating, strangulation, and being driven over. There were up to 35 injuries on her body. There were indications that she was dead before she was driven over, but even that was not certain.

Bedford also would distinguish the circumstances of Bradish's death from other cases where the hard 40 was imposed due to the heinous, cruel, and atrocious nature of the victim's death. He contends that those cases involved slow deaths preceded by physical and mental torment. He cites *State v. McKinney*, 265 Kan. 104, 961 P.2d 1 (1998); *State v. Brady*, 261 Kan. 109, 929 P.2d 132 (1996); *State v. Gideon*, 257 Kan. 591, 894 P.2d 850 (1995); and *State v. Bailey*, 251 Kan. 156, 834 P.2d 342 (1992). In *Brady*, the defendant made his two victims lie on the floor for 15 minutes before he shot one, then the other. In *Gideon*, the defendant drove the victim to the country, raped and anally sodomized her, forced her to stand naked in a field, handed her a screwdriver and told her one of them had to die, then strangled her. The victim's awareness of her impending death was apparent in her asking Gideon "to make sure her mom and dad knew she loved them both." 257 Kan. at 602. In *Bailey*, the female victim was taken from place to place by a group of young men while they repeatedly stabbed her friend. She was forced to perform oral sex on one of the young men, and eventually she was stomped to death. In *McKinney*, the victim was stabbed in the neck and throat approximately 20 times while he was alive and swallowing blood. He died from asphyxiation after sufficient pressure was applied to his neck to fracture his hyoid bone.

The only case cited by the State that was not relied on by the defendant is *State v. Alford*, 257 Kan. 830, 896 P.2d 1059 (1995). In that case, the defendant argued that "the murder was simply a routine shooting" rather than an especially heinous, atrocious, and cruel one. 257 Kan. at 837. The court disagreed:

"Generally, deaths caused by shooting do not result in a finding that the manner in which they were conducted was heinous, atrocious, or cruel. See Malone, *The Kansas "Hard-Forty" Law*, 32 Washburn L.J. 147, 156 (1993), stating that, as a general rule, deaths caused by stabbing, bludgeoning, strangling, burning, or drowning often result in a finding of this circumstance, while deaths from shooting do not. However, in this particular case, there was sufficient evidence to conclude that Jackson was killed in a heinous, atrocious, or cruel manner.

"The record reveals that the defendant entered the kitchen waving his gun. He chased Jackson into the lobby of the restaurant and shot her twice. He then forced Jackson back into the kitchen and when she attempted to flee, shot her again. Finally, as she was barely moving yet still trying to escape, he dragged her around the corner of the kitchen, all the while attempting to fire the gun which had jammed. After a long series of clicks from the jammed gun, he administered the final two bullets. Based on these facts, the jury's determination that the murder was committed in an especially heinous, atrocious, or cruel manner is supported by substantial competent evidence." 257 Kan. at 838.

In summary, there do not seem to be any pivotal differences between the factual circumstances of the present case and those of the cases cited by the parties. In this case, Bradish was bludgeoned by the defendant with his fists and with a radio. She was strangled with an extension cord until her hyoid bone fractured. She was driven over after Bedford pushed her from the car. The pathologist was unable to pinpoint the cause of death, which allows for the possibility that she remained conscious throughout much of her ordeal. Thus, after a review of all the evidence, viewed in the light most favorable to the State, it can be said that a rational factfinder could have found by a preponderance of the evidence the existence of the aggravating circumstance of an especially heinous, atrocious, or cruel manner of murder. See *State v. Spain*, 263 Kan. 708, Syl. § 6.

Weighing aggravating and mitigating circumstances is not a numbers game. "One aggravating circumstance can be so compel-

ling as to outweigh several mitigating circumstances." *State v. Phillips*, 252 Kan. 937, Syl. ¶ 3.

In this case, the defendant contends that the victim's participation was such a significant circumstance in the horrible outcome of their brief acquaintance that, combined with the other mitigating circumstances found by the trial judge, it doubtlessly outweighed the aggravating circumstance. The State's only response ignores what the defendant argues is the key factor—the victim's participation in defendant's conduct: "[T]he heinousness of Bedford's crimes far outweigh the fact that he was young and had no priors."

Neither party cites a case in which this court has discussed what the standard ought to be when the court reviews a trial court's weighing of aggravating and mitigating circumstances. However, in *State v. Spain* (No. 81,438, filed April 21, 2000), the defendant argued that where the trial court finds the aggravating and mitigating circumstances are of equal weight, the imposition of the hard 40 sentence constitutes cruel and unusual punishment. Concluding that it did not, we held: "The weighing of aggravating and mitigating circumstances is within the sound discretion of the district court and will not be disturbed on appeal absent an abuse of discretion." Syl. ¶ 1.

The applicable statute provides that if the trial court finds that one or more aggravating circumstances exist and "that the existence of such aggravating circumstances is not outweighed by any mitigating circumstances which are found to exist, the defendant shall be sentenced" to the hard 40. K.S.A. 1999 Supp. 21-4635(c). The legislature invested the trial judge with discretion in weighing circumstances but mandated the final outcome. We find no abuse of discretion in the district court's sentencing the defendant to the hard 40.

Finally, Bedford argues that cumulative trial errors require reversal of his conviction.

"Cumulative trial errors, when considered collectively, may be so great as to require reversal of the defendant's conviction. The test is whether the totality of circumstances substantially prejudiced the defendant and denied the defendant a fair trial. No prejudicial error may be found upon this cumulative effect rule,

however, if the evidence is overwhelming against the defendant." *State v. Lumbrera*, 252 Kan. 54, Syl. ¶ 1, 845 P.2d 609 (1992).

In this case, our review has revealed no trial errors of consequence. Thus, the cumulative trial error rule is not applicable.

The judgment of the district court is affirmed.