(54 P.3d 500)
No. 85,446

STATE OF KANSAS, *Appellee,* v. KELLY W. MAXFIELD, *Appellant.*

Opinion filed December 21, 2001.

*Virginia A. Girard-Brady*, of Lawrence, for the appellant.

*Stephen D. Maxwell*, assistant attorney general, and *Carla J. Stovall*, attorney general, for the appellee.

Before PIERRON, P.J., ELLIOTT, J., and WAHL, S.J.

PIERRON, J.: Defendants Kelly W. Maxfield, Andrew J. Lloyd, and Rex A. Pendlay were indicted by a grand jury for one count of second-degree unintentional murder in the death of Brian Wagner.

Maxfield, Lloyd, and Pendlay were tried together, and a jury convicted all three of the lesser included offense of involuntary manslaughter. Maxfield argues there was insufficient evidence to support his conviction, the trial court erred in not granting a motion for separate trials, the trial court erred in not granting a mistrial based on the prosecutor's introduction of inadmissible hearsay, the prosecutor committed reversible error during closing arguments, the trial court should have instructed on the lesser included offense of battery, and the cumulative effect of the trial errors denied him a fair trial. Lloyd and Pendlay appealed on similar grounds.

On April 21, 1999, at approximately 1:30 a.m., Brian Wagner sustained severe injuries during a fight in the parking lot of Turtle's Bar in Emporia. Wagner was hospitalized and died 6 days later.

Adam Best, Wagner's roommate and teammate on the Emporia State University football team, testified that he, Wagner, and Trevor Hall went out around 10 p.m. that evening and visited several bars. While Wagner and Hall drank heavily, Best was not drinking to help rehabilitate his injured knee and in hopes of bettering his grades. Best said that at one of the bars the men spoke with Tabitha Thomas and Megan Scott who they knew from school.

Later, the men headed to a friend's house in Best's Jeep. As they passed the Turtle's parking lot, they saw Thomas' white convertible parked in the alley and an altercation between a group of girls—Thomas, Scott, Leah Johnson, and Tracy Uttinger. Best drove

around the block and parked close to the convertible to investigate the situation. Hall got Thomas' attention, and she came over to the Jeep. Thomas was visibly upset and said she had been in an argument with Uttinger.

Best testified that Uttinger came over to the Jeep and began arguing with Wagner, who was in the back seat. Best said the argument consisted of rude comments and name calling by both Wagner and Uttinger. While the argument between Wagner and Uttinger escalated, Pendlay, Maxfield, Nick Buxton, and Ryan Law intently watched the situation from outside of Bruff's Bar. After helping pick up glasses and conversing with the bartender at Bruff's, Lloyd and Jessica Burress joined the four outside. Buxton, who was Uttinger's boyfriend, walked over to the Jeep with the rest of the men to investigate the problem between Wagner and Uttinger.

Buxton and Hall began a heated conversation which eventually led to the fatal fight. The testimony concerning the participants of the fight and their actions is highly controverted. One certainty in this case is that a majority, if not everyone but Best, was intoxicated. The jury had a monumental task of not only listening to many days of testimony, but also of keeping straight the witnesses and their relationships, and their definite biases. It is also clear that during the fight, Wagner was chased, and he either turned around or began running backwards and fell, hitting the back of his head on the pavement. Although strenuously challenged, one or more witnesses testified that at some point they saw Lloyd, Maxfield, and Pendlay on top of Wagner striking him while he lay motionless on the ground. As noted before, there was a welter of conflicting testimony.

Jennifer McLinn testified she worked at Bruff's and was leaving when she heard screaming from the Turtle's parking lot. She saw a group of men involved in a fight. McLinn saw three men chasing Wagner, who was running forward and then backwards. The three men were swinging at Wagner as they ran, and then Wagner fell backwards, hitting his head on the pavement. Wagner lay motionless with his hands at his side, and the three men began hitting him. McLinn saw Lloyd, whom she knew from work, strike Wagner

once on the upper head. She screamed at the other two men to stop hitting Wagner because he was unconscious, but they continued. McLinn ran back inside Bruff's and told her boss to call the police.

When Officer Ray Mattas arrived on bicycle patrol, he saw a man laying unconscious in the center of the Turtle's parking lot. Buxton and two women were at the man's side attempting to render aid. Officer Mattas said Wagner's nose was pretty much flat, like it was pushed back into his face, and he was gurgling on blood and having a hard time breathing.

Paramedics arrived at the Turtle's parking lot at 1:47 a.m. Wagner was taken to Newman Hospital. Dr. Kyle Garrison, the emergency room doctor, testified that Wagner had massive upper body trauma confined mostly to his head and shoulder region. He diagnosed Wagner as suffering from a closed-head injury. Dr. Garrison also testified that Wagner's blood was tested at the hospital and had an alcohol content of .195.

Due to the internal injuries to his head, Wagner was flown by Life Watch to Wesley Hospital in Wichita. Dr. Eustaquio Abay, a neurosurgeon who cared for Wagner, testified that Wagner had a basilar skull fracture, a broken nose, facial fractures of the nasal bone and cheekbone, bruises on the forehead, bruises on both sides of head, fracture of left temporal bone, and a bruise, contusion, or swelling behind the head. Dr. Abay said Wagner had substantial injuries to his head which were *not* caused by a single blow. Dr. Abay testified Wagner never regained consciousness and, after extensive testing, was declared brain dead. Life support was removed on April 27, 1999, and Wagner died that day.

The coroner, Dr. Erik Mitchell, testified that Wagner had died of blunt head trauma. Dr. Mitchell listed Wagner's injuries: multiple scalp bruises and scalp wounds, loose left incisor tooth, lacerated lip, slight subdural blood, left occipital fracture of the skull, left cerebellar contusion and necrosis, frontal contusions and hematomas, bruised tongue, bruised and injured neck and collarbone, blood on the epiglottis, and multiple facial injuries. The medical care witnesses explained the coup and contre coup injuries sus-

tained by Wagner's brain as it was violently forced backward and then forward when he struck his head on the pavement.

Dr. Mitchell testified that Wagner's injuries were caused by multiple blows to his head. Dr. Mitchell concluded Wagner died not from a single injury, but as a result of all injuries combined. He likened the situation to driving a nail into a board — first you start out with a heavy blow, which drives the nail in halfway, and then additional smaller blows until the nail is driven fully into the board.

On September 8, 1999, a grand jury indicted Lloyd, Maxfield, and Pendlay with one count of unintentional second-degree murder. Separate complaints were filed against Lloyd, Maxfield, and Pendlay. However, all three complaints were consolidated for trial, over strenuous objection, and the defendants were tried together. After nearly a 2-week trial, the jury convicted all three defendants of the lesser included offense of involuntary manslaughter. None of the defendants had any criminal history, and each was sentenced to the presumptive sentence of 32 months' imprisonment.

First, Maxfield argues there was insufficient evidence from which a rational factfinder could have concluded he was guilty beyond a reasonable doubt of involuntary manslaughter.

When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Jasper*, 269 Kan. 649, 655, 8 P.3d 708 (2000).

Maxfield was charged with second-degree unintentional murder, but was convicted of the lesser included offense of involuntary manslaughter. After instructing on second-degree murder, the trial court instructed the jury it could find Lloyd guilty of the lesser included offense of involuntary manslaughter if the State proved "[t]hat the defendant Kelly Maxfield unintentionally killed Brian Wagner . . . [and] (a) [t]hat it was done recklessly or (b) [w]hile in the commission of the offenses of either disorderly conduct or battery as defined in these instructions." The trial court then instructed the jury on the elements of disorderly conduct and battery.

Maxfield argues the State failed in its burden to prove that he unintentionally killed Wagner, *i.e.*, that his conduct caused Wagner's death. He contends that since the jury did not convict him of unintentional second-degree murder, then the jury must have concluded the State failed to prove beyond a reasonable doubt that he struck Wagner in the head while he lay unconscious on the ground. Maxfield argues that even if the jury believed he struck Wagner on the ground, but concluded that such conduct only amounted to involuntary manslaughter, the medical evidence was insufficient to show that his conduct actually killed Wagner.

There is sufficient evidence demonstrating Maxfield's participation in the fight and his conduct against Wagner after Wagner fell to the ground.

McLinn testified she worked at Bruff's and that as she headed back to her car after the bar closed, she heard screaming from the Turtle's parking lot. When she walked back to the parking lot, she saw a group of men involved in a fight. She saw three men chasing Wagner, who was running forward and then backwards. The three men chasing Wagner were swinging at him as they ran, and then Wagner fell backwards, hitting his head on the pavement. Wagner lay motionless with his hands at his side. The three men began hitting Wagner on the ground. McLinn saw Lloyd, whom she knew from work, strike Wagner once in the upper head. McLinn screamed at the other two men to stop hitting Wagner because he was unconscious, but they continued, and she ran back inside Bruff's and called the police. McLinn described the other two men as one with a yellow shirt, blondish red hair, and a goatee and the other man with a white T-shirt, dark hair, and tan pants.

Ryan Law testified Maxfield was involved in the fight. As Law watched the fight, he said Maxfield and Pendlay came running past him and they were chasing Wagner. Law said Wagner tripped and hit his head on the concrete. Wagner did not move after the fall. Law testified that after Wagner's fall, Maxfield got on top of Wagner and hit him two or three times in the stomach and kidney area.

Tracy Uttinger testified that at the end of the fight, she saw Wagner on the ground and Maxfield was on top of him. She said Maxfield had on a white T-shirt and was hitting Wagner in the

stomach. Uttinger said she told the prosecutor in the interview that she could not believe Maxfield was hitting Wagner, and because Maxfield was her friend, she did not want to say anything about him initially.

Jessica Burress testified that after Wagner went down, Maxfield approached Wagner on the right side. She said Maxfield hit Wagner two or three times in the upper chest and head area. Burress said she could not see exactly where Maxfield was hitting Wagner.

Detective Davis testified Buxton told him he saw Maxfield hit Wagner two or three times while Wagner was on the ground and that Pendlay and Lloyd were around somewhere. At trial, Buxton said he did not see anyone strike Wagner on the ground.

The medical evidence produced by the State also supports Maxfield's conviction. Dr. Mitchell testified Wagner's injuries were caused by multiple blows to his head. Dr. Mitchell concluded Wagner died not from a single injury, but as a result of all injuries combined.

We have thoroughly reviewed the extensive record produced by Maxfield's lengthy trial. We recognize the inconsistences of the evidence and how some witnesses implicated certain defendants and other witnesses testified completely to the contrary. However, one of the biggest hurdles Maxfield has on appeal is that we will not reweigh the evidence or pass on the credibility of the witnesses. See *State v. Orr*, 262 Kan. 312, 322, 940 P.2d 42 (1997). Only if no reasonable juror could arrive at the conclusion the jury reached will we reverse a verdict. After a review of all the evidence, viewed in the light most favorable to the prosecution, we find there is sufficient evidence to support Maxfield's conviction for involuntary manslaughter beyond a reasonable doubt.

Next, Maxfield argues the trial court committed reversible error when it denied his motion to sever. As a result, he contends, the trial court's decision compromised his ability to present a defense and denied him a fair trial.

The determination of whether defendants charged separately may be tried together is in the trial court's discretion. Therefore, the trial court's decision is reviewed by an abuse of discretion standard. *State v. Aikins*, 261 Kan. 346, 359, 932 P.2d 408 (1997). The

burden on the movant is to present sufficient grounds to establish actual prejudice. *State v. Vincent*, 258 Kan. 694, Syl. ¶ 1, 908 P.2d 619 (1995). In *State v. Butler*, 257 Kan. 1043, Syl. ¶ 9, 897 P.2d 1007 (1995), *modified on other grounds* 257 Kan. 1110, 916 P.2d 1 (1996), the court set forth the factors for a court to consider in resolving a motion for severance:

"(1) that the defendants have antagonistic defenses; (2) that important evidence in favor of one of the defendants which would be admissible on a separate trial would not be allowed on a joint trial; (3) that evidence incompetent as to one defendant and introducible against another would work prejudicially to the former with the jury; (4) that the confession by one defendant, if introduced and proved, would be calculated to prejudice the jury against the others; and (5) that one of the defendants who could give evidence for the whole or some of the other defendants would become a competent and compellable witness on the separate trials of such other defendants."

All three defendants requested that the court grant them separate trials. At the hearing on the motions, Lloyd said that if Maxfield were called to testify in a separate trial, Maxfield would state he never saw Lloyd strike Wagner, and there would be no way to present this exculpatory evidence in a combined trial if Maxfield chose not to testify. Lloyd admitted to the trial court that the same problem of Maxfield not testifying would occur in separate trials depending on the order of the individual trials. Lloyd also told the court Pendlay would make a statement in which he would inculpate himself and Lloyd.

The State responded at the severance hearing that it would not be offering Pendlay's out-of-court statement in its case in chief. The trial court stated it would rely on the State's contention. Counsel for all three defendants then argued there was a great potential for antagonistic defenses. Lloyd also suggested the State could bolster a weak case against one defendant by using a stronger case of another defendant, which would not occur in a separate trial. The State responded that it would not offer any out-of-court statements of any defendants in any way in the case in chief and, therefore, there would be no problems under *Bruton v. United States*, 391 U.S. 123, 136, 20 L. Ed. 2d 476, 88 S. Ct. 1620 (1968). The State

then clarified that it would be using a statement made by Lloyd in which he implicated himself.

The trial court denied the motions for separate trials. The judge held: "I am convinced that the Court can provide adequate safeguards at a trial together to continue this trial as one trial and not three separate trials. The burden of proof on the defendants has not been met."

In his appellate brief, Maxfield fails to explain how he was unfairly prejudiced by not having a separate trial. He discusses the inconsistency concerning how many men allegedly hit Wagner while he was on the ground. Maxfield then states: "[T]he evidence in this case necessarily required Appellant to point the finger at his codefendants, and impliedly allege through the use of cross-examination and the testimony of defense witnesses, that it was the other two, not he, who had struck Wagner after the fall."

In *Bruton*, the United States Supreme Court held the prejudicial effect of the use of an out-of-court statement or confession made by one defendant which served to inculpate another defendant could not be cured through the use of a limiting instruction. The court concluded the admission of these inculpating statements violated a defendant's Sixth Amendment right to confront the witness against him or her. 391 U.S. at 136.

As the trial court pointed out, the prejudice claimed by the three defendants might still arise in separate trials depending on the order of the individual trials. The trial court stated that if it severed the trials, it would be forced into a situation of playing favorites in setting the order of separate trials because all three defendants would not be able to benefit from the severance.

We find no abuse of discretion in the trial court's decision not to grant the defendants separate trials. Maxfield has presented no evidence he was not able to "point the finger" at his codefendants through cross-examination and defense witnesses. Furthermore, after thorough review of the trial transcript, we find the trial court was true to its word that it would not allow any statements from the witnesses concerning statements made by one defendant implicating or exculpating the other two defendants. The trial transcript is full of examples of witnesses being instructed to not reveal

any statements made by the defendants concerning the other defendants.

Dovetailing on the issue of separate trials, Maxfield argues the trial court erred in not granting a mistrial based upon the prosecutor's introduction of inadmissible hearsay testimony.

The declaration of a mistrial is a matter entrusted to the trial court's sound discretion. Maxfield has the burden of showing substantial prejudice before we will find an abuse of discretion. See K.S.A. 22-3423(1); *State v. Arteaga*, 257 Kan. 874, Syl. ¶ 6, 896 P.2d 1035 (1995). Judicial discretion is abused only when no reasonable person would take the view of the trial court. *State v. Rinck*, 256 Kan. 848, 853, 888 P.2d 845 (1995) (no abuse of discretion found in district court's denial of motion for mistrial).

The starting point for this argument is the State's assurance and the trial court's acceptance during pretrial motions that the State would not introduce any statements made by one defendant which would be prejudicial to either one or both of the codefendants. During trial, Buxton testified on behalf of the State. Buxton testified that a few weeks before trial, he gave a sworn statement to the State in exchange for immunity. Buxton testified that during the fight he saw Maxfield and Wagner exchange blows, but that he did not see Maxfield or anyone else hit Wagner after Wagner was on the ground. Buxton then admitted that he gave Detective Davis a different story a month after the fight in which he said Maxfield struck Wagner in the head two or three times after Wagner was on the ground. The prosecutor then asked whether Buxton told Detective Davis the truth and he answered, "Well, I was trying to but what I really ended up doing was repeating a lot of rumors that I had heard over and over again. And at that time I just — I don't know, I guess I kind of believed them to be true."

Out of the hearing of the jury, counsel for Maxfield moved for a mistrial based upon the fact that Detective Davis' report showed that one of the people Buxton had talked to was Lloyd. Maxfield argued the evidence violated the *Bruton* rule and the State had succeeded in eliciting the very evidence that it assured the court it would not. Maxfield asked the court to strike the evidence from the record if it did not grant a mistrial. The trial court denied the

motion for mistrial, finding the testimony was admissible as a prior inconsistent statement.

After Detective Davis was recalled to the stand to confirm what Buxton had told him, counsel for Maxfield renewed the motion for severance, arguing that he was prevented from fully cross-examining Buxton as to the source of his information and therefore Maxfield was unable to confront the witnesses against him.

As previously discussed, *Bruton* holds that the admission of a codefendant's confession implicating the defendant at trial is prejudicial error when the defendant does not have the opportunity to cross-examine the confessing codefendant. 391 U.S. at 137. The court in *State v. Butler*, 257 Kan. 1110, 1114, 916 P.2d 1 (1996), stated that the Confrontation Clause of the Sixth Amendment guarantees the right of a criminal defendant to confront the witnesses against the defendant, including the right to cross-examine those witnesses.

Maxfield argues he was unable to adequately cross-examine Buxton to determine who was responsible for the rumors he relied on in concluding that he saw Maxfield strike Wagner two or three times while Wagner was on the ground. He contends that if Maxfield testified the rumors came from Lloyd, then he would be unable to confront Lloyd, who did not testify at trial. Maxfield also contends that eliciting this testimony showed ill will on the part of the prosecutor because he already knew about Buxton's prior inconsistent statement and that Buxton relied on Lloyd's statements in giving his statement to Detective Davis.

We do not find the evidence complained of by Maxfield rises to the level requiring a new trial. The purpose of the *Bruton* rule is to prevent evidence of a codefendant's statement from implicating another defendant in a joint trial. 391 U.S. at 137. The statements complained of by the defendant clearly do not fall within that purpose. Simply put, Buxton did not testify concerning statements made by any of the three defendants in this case implicating the other two. Buxton testified that his prior statement to Detective Davis was false because it was based on rumors. Buxton never told the jury whose statements he relied on in formulating the false statement to Detective Davis.

Furthermore, any error the trial court committed in allowing Buxton's testimony was harmless error. See *State v. Clark*, 263 Kan. 370, 376, 949 P.2d 1099 (1997) (errors that do not affirmatively cause prejudice to the substantial rights of the complaining party do not require reversal when substantial justice has been done). The underlying premise of the *Bruton* rule is the Sixth Amendment right to confront witnesses testifying *against* the defendant. Here, Buxton was fully cross-examined concerning the statements he made to Detective Davis. On cross-examination, Buxton testified the statement he gave Detective Davis about seeing Maxfield strike Wagner on the ground was not true. What better cross-examination is there than one in which a witness, who is given immunity, testifies that the incriminating statement was not true? Buxton said the reason he recanted the statement made to Detective Davis was because it was based on rumors.

We find the trial court did not abuse its discretion in allowing the testimony from Buxton or in denying Maxfield's motion for a mistrial.

Next, Maxfield argues the prosecutor committed misconduct during closing arguments. The comments at issue were not objected to at trial. Consequently, our review is to determine whether the magnitude of the error of the prosecutor's comments denied the defendant's constitutional right to a fair trial. *State v. McCorkendale*, 267 Kan. 263, Syl. ¶ 6, 979 P.2d 1239 (1999).

In determining whether the prosecutor's comments require a new trial, we first look at whether the remarks were outside of the considerable latitude allowed a prosecutor in closing argument. *State v. Spresser*, 257 Kan. 664, 669-70, 896 P.2d 1005 (1995). If the prosecutor has proceeded beyond the bounds of permissible comment on the evidence, then we determine whether the remarks are so gross and flagrant as to prejudice the jury against the accused and deny him or her a fair trial. See *State v. Lumley*, 266 Kan. 939, 964-65, 976 P.2d 486 (1999).

Maxfield complains of the following statement in the prosecutor's rebuttal closing argument:

"We have a circumstance that the physical evidence, when you start looking at these things and trying to put them together, how could it have gone and what's

the most likely scenario. And, yes, the burden is a reasonable doubt. But that burden of reasonable doubt only goes to the elements that the judge gives you, not what defense counsel want me to be required to prove. Because, believe me, these are intelligent men. They can come up with lots of things that can't ever be proven and keep asking you, as a jury, and with three of them, they get to all do it, you know, they didn't prove this, therefore my guy is not guilty. Nobody is guilty. Well, I suppose Brian is still alive then. He wasn't beaten to death. So you have to work and try to figure out what happened to him."

Maxfield argues the prosecutor's comment that the reasonable doubt standard did not apply to what defense counsel wanted the prosecutor to be required to prove was a clear misstatement of the law. Maxfield contends the prosecutor's statement was clearly outside the wide latitude allowed the prosecutor since the comment had nothing to do with the evidence, but only served to dilute the requirement that the State prove Maxfield killed Wagner.

We find no error in the prosecutor's closing argument such that Maxfield was denied a fair trial. The prosecutor's comment was a simple reminder to the jury that the reasonable doubt standard applied to the elements of the crime as provided in the jury instructions. The prosecutor in no way misstated the reasonable doubt standard. See *State v. Mitchell*, 269 Kan. 349, 360, 7 P.3d 1135 (2000). Understandably, because of the sheer amount of contradicted testimony, this was the prosecutor's attempt to keep the jury focused on the elements of the crime.

Furthermore, we find the prosecutor's statement concerning defense counsel and the unanswered or unproven allegations was not reversible error. The comments clearly do not rise to the level of those in *State v. Magdaleno*, 28 Kan. App. 2d 429, 17 P.3d 974 (2001), or *State v. Pham*, 27 Kan. App. 2d 996, 10 P.3d 780 (2000), where the prosecutor labeled defense counsel as a liar and not interested in the truth. The prosecutor clearly stated in the contested part of the closing argument that "the burden is reasonable doubt" and that the burden "only goes to the elements that the judge gives you."

We find the prosecutor's statements were within the wide latitude permitted during closing argument and the remarks were not so gross and flagrant as to prejudice the jury against Maxfield and deny him a fair trial. See *Lumley*, 266 Kan. at 964-65.

Next, Maxfield argues the trial court erred in not giving the jury instruction for the lesser included offense of battery or disorderly conduct.

The trial court has a duty to instruct on all lesser included offenses established by the evidence. When the trial court refuses to give a specific instruction, the standard of review is to examine all the evidence viewed in the light most favorable to the party requesting the instruction, and determine whether the evidence at trial could reasonably support a jury verdict on the lesser included offense or is contrary to the defense asserted. *State v. Hunt*, 270 Kan. 203, 208-09, 212, 14 P.3d 430 (2000).

Maxfield contends the evidence adduced at trial showed that he may have struck Wagner and may have been involved in brawling and fighting. However, he states that while a reasonable jury could have concluded that he was guilty of battery or disorderly conduct, his conduct was not the cause of Wagner's death. Without the battery instruction, Maxfield argues, the jury was not given the opportunity to find that he did not cause Wagner's death. Maxfield theorizes that if the jury believed he had done something, but had not been the direct cause of Wagner's·death, then without a battery instruction the jury had no choice but to convict him of the greater crime of involuntary manslaughter. Maxfield argues such a theory is bolstered by the State's closing argument which suggested that the State did not have an obligation to prove that Maxfield did anything other than participate in the fight in order to support a conviction of involuntary manslaughter.

Maxfield was charged with second-degree unintentional murder, but was convicted of the lesser included offense of involuntary manslaughter. Second-degree unintentional murder, as defined in K.S.A. 21-3402(b), is the killing of a human being committed "unintentionally but recklessly under circumstances manifesting extreme indifference to the value of human life." Involuntary manslaughter, as defined in K.S.A. 2000 Supp. 21-3404(b), is the unintentional killing of a human being committed in "the commission of, or attempt to commit, or flight from any felony, other than an inherently dangerous felony as defined by K.S.A. 21-3436."

Under the second-degree unintentional murder charge, the trial court instructed the jury that in order to convict Maxfield, the State had to prove "[t]hat the defendant Kelly Maxfield killed Brian Wagner unintentionally but recklessly under circumstances showing extreme indifference to the value of human life." The trial court also instructed the jury it could find Maxfield guilty of the lesser included offense of involuntary manslaughter if the State proved "[t]hat the defendant Kelly Maxfield unintentionally killed Brian Wagner . . . [and] (a) [t]hat it was done recklessly or (b) [w]hile in the commission of the offenses of either disorderly conduct or battery as defined in these instructions." The trial court then instructed the jury on the elements of disorderly conduct and battery.

Although the argument is technically plausible, we find it is highly unlikely the jury would convict on murder or manslaughter because it could not convict of battery or disorderly conduct. The commission of a battery or disorderly conduct in the present case was an element of the offense of involuntary manslaughter, and a jury would need to find Maxfield committed one of those two crimes in order to sustain a conviction for involuntary manslaughter. However, battery and disorderly conduct, while proven, are not lesser included offenses of involuntary manslaughter here. An instruction on a lesser included offense is not proper if from the evidence the jury could not reasonably convict of the lesser offense. *State v. Robinson*, 261 Kan. 865, 883, 934 P.2d 38 (1997). "Where there is no substantial evidence applicable to the lesser degrees of the offense charged, and all of the evidence taken together shows that the offense, if committed, was clearly of the higher degree, instructions relating to the lesser degrees of the offense are not necessary." *State v. Gibbons*, 256 Kan. 951, 955, 889 P.2d 772 (1995).

The State charged Maxfield with a homicidal crime. Maxfield's commission of the battery merged into the homicidal crimes of unintentional second-degree murder and involuntary manslaughter when Wagner died 6 days after the fight. A completed homicide, whatever its degree, does not have any nonhomicidal lesser included offenses. Rather, the jury can acquit a defendant if it does not believe a defendant's actions resulted in the death of a victim.

The trial court did not err in refusing to give the jury a lesser included instruction on battery or disorderly conduct.

Last, Maxfield argues the cumulative effect of the trial errors denied him a fair trial and justify reversal of his conviction.

" 'Cumulative trial errors, when considered collectively, may be so great as to require reversal of the defendant's conviction. The test is whether the totality of the circumstances substantially prejudiced the defendant and denied the defendant a fair trial. No prejudicial error may be found upon this cumulative effect rule, however, if the evidence is overwhelming against the defendant.' [Citation omitted.]" *State v. Bedford*, 269 Kan. 315, 332-33, 7 P.3d 224 (2000).

Maxfield argues that even if each of the errors discussed on appeal do not merit reversal on their own, the cumulative effect of the errors was substantially prejudicial and denied him a fair trial. He contends the evidence against him was far from overwhelming and his participation in the fight is unclear at best. He also states the medical evidence does not demonstrate whether Wagner died from injuries as a result of the fight or the injuries sustained when he fell backwards and hit his head.

The only errors Maxfield cites to are those already discussed above. Having found no error in any of Maxfield's issues, his claim of cumulative error must likewise fail. See *State v. Lumbrera*, 252 Kan. 54, 57, 845 P.2d 609 (1992). Although the evidence against Maxfield cannot be characterized as overwhelming, there is certainly an abundance of testimony, although controverted, describing Maxfield's participation in the fight and his striking Wagner after Wagner fell on the ground and lay unconscious. See *State v. Valdez*, 266 Kan. 774, 802, 977 P.2d 242 (1999). There was evidence that Wagner died from the cumulative effects of all the blows, which the jury, under these facts, could attribute partially to Maxfield.

Affirmed.