(50 P.3d 89)

No. 86,290

STATE OF KANSAS, *Appellee*, v. RUSSELL LEE SHUMWAY,
*Appellant*.

Opinion filed
July 19, 2002.

*R. Kip Elliot* and *Julia Spainhour*, of Northeast Kansas Conflict Office, of Topeka, for the appellant.

*Robert D. Hecht*, district attorney, *Deborah L. Hughes*, assistant district attorney, and *Carla J. Stovall*, attorney general, for the appellee.

Before LEWIS, P.J., BRAZIL, S.J., and GLENN D. SCHIFFNER, District Judge, assigned.

BRAZIL, J.: Russell Lee Shumway appeals his conviction of murder in the second degree, arguing that the district court violated

his due process rights by admitting unreliable testimony against him, that the district court erred in instructing the jury on murder in the second degree as a lesser included offense of felony murder, and that the district court imposed a disproportionate sentence in violation of his Eighth Amendment rights.

We affirm.

On the morning of October 8, 1999, Mitch Davis was discovered in his backyard by a neighbor. He had suffered multiple blows to the head from a blunt instrument, causing hemorrhaging and, ultimately, death. An autopsy also revealed large amounts of methamphetamine in the victim's bloodstream; however, the investigating pathologist determined the use of drugs was not a contributing factor in the death.

Shortly thereafter, the Scientific Investigation Unit of the Topeka Police Department processed the crime scene and confiscated a blood-stained, 2x4 board, which had been found by a neighbor in the alley behind the victim's property. The blood on the board was matched to blood from the victim. Although the board was tested for fingerprints, the results were inconclusive.

Pursuing some tips received from the Crime Stoppers network, the police attempted to track down some potential witnesses, John and Mary Finney, who, following the murder, were either living in a motel or on the street. After the investigators persistently called John Finney's mother in an attempt to locate him, Finney contacted the police to arrange an interview. On October 21, 1999, Finney appeared at the police station.

During an interview, Detective Eaton produced some photographs of the crime scene, a few Crime Stoppers reports, and a couple of fabricated reports implicating Finney and the defendant in the murder. Despite the pressure the police tactics were designed to bring to bear, Finney repeatedly denied any involvement in the crime and eventually requested permission to leave.

However, when the detective asked Finney to stay a bit longer, Finney consented. The detective then sought the assistance of Captain Mills, who also spoke with Finney, promising to help him out and indicating that he did not believe that Finney had committed the murder. Still, Finney refused to talk, desiring to talk with his

wife, Mary. Consequently, when Finney promised to return the following day, the police released him.

Finney did not return as promised the following day. Rather, the police searched for nearly 2 weeks before locating him and Mary at a hotel. With some prompting by the police, the Finneys reluctantly agreed to return to the police station with the officers to talk about the murder investigation.

John Finney told the police, in that interview, that the defendant had committed the murder. According to Finney, Shumway and he had been drinking and decided to visit a friend in North Topeka or to get money from Finney's mother for more alcohol. Because neither Finney nor Shumway owned a vehicle other than a mobile home, they started out on foot.

As they walked through the alley behind the victim's house, Finney noticed a couple of bicycles in the victim's yard and suggested that they take the bicycles. Shumway and Finney entered the yard, but they soon realized that the bicycles were chained.

According to Finney, he then suggested leaving the yard and returned to the alley. Finney realized that Shumway had not followed him, so Finney peered over the privacy fence into the backyard. He stated he witnessed Shumway hitting the victim with a 2- to 3-foot long 2x4.

Finney asked him to stop. Shumway allegedly requested Finney to take the 2x4 while he searched the victim's pockets. Finney refused, announced that he was leaving, and ran home. He explained to his wife and to Shumway's wife what had occurred.

When Shumway returned, he reported that he had just beaten someone, had taken some credit cards and money from the victim, and had hidden the stolen items under a bush. Shumway had blood stains on his sandals, shorts, and shirt. While he showered, his wife supposedly disposed of the sandals, shirt, and shorts.

Based upon these statements and the circumstantial physical evidence gathered from the crime scene, Shumway was charged with first-degree murder, aggravated robbery, and attempted misdemeanor theft.

While Shumway was incarcerated in the county jail, pending his trial, he allegedly sought the advice of Edward Radford, commonly

known to assist inmates in postconviction motions for relief. According to Radford, Shumway eventually admitted that he had killed the victim. He also purportedly detailed his participation in the crime to two other inmates of the county jail, John Powers and Russell Lutz.

After several days of trial, the prosecution requested an instruction on second-degree murder as a lesser included offense of first-degree felony murder, which the court granted. Subsequently, the jury returned a verdict finding Shumway guilty of murder in the second degree and attempted misdemeanor theft.

At sentencing, the district court denied Shumway's motion for a downward departure and sentenced him to serve a controlling sentence of 620 months.

## STATEMENTS OF THE PROSECUTION WITNESSES

Shumway's primary claim relates to the State's reliance upon the testimony of John and Mary Finney to establish the basis for his murder conviction. He claims that John Finney's statements were impermissibly coerced by the investigating officers; thus, the statements were inherently unreliable and should not have been admitted against Shumway. He also argues that Mary Finney's testimony was tainted by association with John Finney's allegedly coerced statements.

The prosecution first argues that Shumway possesses no standing to challenge the coercive nature of the interrogation techniques used to elicit statements from John Finney because constitutional protections must be raised by the person claiming that such rights have been infringed. If Shumway was attempting to exclude the statements because Finney's right to self-incrimination had been violated, the State's position would be affirmed. *State v. Valdez*, 266 Kan. 774, 794, 977 P.2d 242 (1999) ("[T]he right against self-incrimination pertains only to the person incriminated by his own testimony, not to others incriminated by his testimony.").

However, the question presented by this appeal concerns Shumway's right to a fair trial.

"It is now axiomatic that a defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary

confession, without regard for the truth or falsity of the confession, [citation omitted], and even though there is ample evidence aside from the confession to support the conviction." *Jackson v. Denno*, 378 U.S. 368, 376, 12 L. Ed. 2d 908, 84 S. Ct. 1774 (1964).

If John Finney's statements had been involuntarily coerced by police conduct, rendering such statements inherently unreliable, the use of the statements jeopardized Shumway's right to due process. Thus, he possesses standing to challenge the admission of such statements at trial. *United States v. Gonzales*, 164 F.3d 1285, 1289 (10th Cir. 1999) (concluding that, although a defendant's rights are not directly implicated by police coercion of a witness' statements, the defendant's right to due process is implicated by admission of *false* statements involuntarily elicited from the witness).

As the State contends, a defendant's allegation that a witness' testimony is untrue does not rise to the level of a constitutional violation. Determining the veracity of a witness' statements is a function of the jury. See *Jackson*, 378 U.S. at 386-87 n.13 ("Just as questions of admissibility of evidence are traditionally for the court, questions of credibility, whether of a witness or a confession, are for the jury.").

Therefore, Shumway's belief that John and Mary Finney fabricated a story to incriminate him, standing alone, does not provide him with standing to argue that his due process rights were violated. Shumway possessed all of the truth-testing devices of the criminal process, such as the right to confront and cross-examine the Finneys. Their veracity was a question for the jury.

However, where law enforcement officers overcome the will of an individual and coerce statements from the person supporting the officers' interpretation of the evidence, due process is offended regardless of the truth or falsity of the statements. Thus, the use of coerced statements from a material witness may be properly challenged by a criminal defendant.

To determine whether an accomplice witness' statements are voluntary, a court looks at the totality of the circumstances. Factors include the duration and manner of the interrogation; the ability of the individual on request to communicate with the outside

world; the individual's age, intellect, and background; and the fairness of the officers in conducting the interrogation. The essential inquiry is whether the statements were the product of the free and independent will of the individual. The prosecution bears the burden of proving that an accomplice witness' statements are admissible by a preponderance of the evidence. *Cf.*, *State v. Lane*, 262 Kan. 373, 385, 940 P.2d 422 (1997).

During the *Jackson v. Denno* hearing held in this case, the evidence established that only John Finney was initially interviewed by the police. In the course of the interview, the interrogating officers exhibited a couple of falsified documents incriminating Finney and the defendant. The officers also promised to assist Finney and to protect him.

While these practices cannot be commended, it is unnecessary to decide whether such practices were unconstitutionally coercive. It is clear that Finney did not succumb to the coercive practices applied by the police during his first interview. Not only did Finney continually deny complicity in the murder, he continually denied any knowledge of the murder or Shumway's participation in the murder. Moreover, he testified during the hearing that he was not concerned by the falsified police reports because he knew that he had not touched the board used to kill the victim.

Two weeks after the initial interview, the officers interviewed John Finney again, but any coercive effect created by the first interview was too attenuated from the second interview to raise doubts concerning the voluntary nature of Finney's subsequent statements. See *Wong Sun v. United States*, 371 U.S. 471, 487-88, 491, 9 L. Ed. 2d 441, 83 S. Ct. 407 (1963) (finding a sufficient attenuation when "several" days passed between illegal government conduct and the confession).

In this case, any alleged coercive tactics used by law enforcement officers in an initial interview with a witness were too attenuated from a second interview 2 weeks later to raise doubt concerning the voluntary nature of the witness' statements.

During the second interview, no false documents were presented. While both John and Mary Finney admitted to using methamphetamine and alcohol prior to their interviews, both also tes-

tified that the use of these substances did not hamper their understanding of the questions posed to them. Consequently, there was no evidence from which to conclude that John Finney's statements, and those of Mary, were not the product of their own free and independent desire to relate the events of the murder.

Shumway also alleges that the first police interview of John Finney was highly suggestive. He claims that Finney's testimony was exclusively based upon photographs and police reports shown to Finney in his interview which Finney used to fashion his testimony during his 2-week hiatus from police contact.

This argument does not concern the voluntariness of a witness' statements, so much as it casts suspicion on the authenticity of the witness' identification of the perpetrator of the crime. Although this precise issue has never been raised in a reported Kansas opinion, the standard of review of an allegedly suggestive witness identification procedure has frequently been addressed by the courts of this state. See, *e.g.*, *State v. Love*, 267 Kan. 600, 603, 986 P.2d 358 (1999).

Determining whether the suggestive nature of a witness identification violates a defendant's due process of law is a mixed question of fact and law. An appellate court reviews the factual underpinnings of the district court's decision under a substantial competent evidence standard but exercises unlimited review of the legal conclusion to be drawn from those facts. See *Love*, 267 Kan. at 603.

The linchpin of the constitutional analysis undergirding identification procedures is the reliability of the identification. See *Grubbs v. Hannigan*, 982 F.2d 1483, 1490 (10th Cir. 1993) (citing *Neil v. Biggers*, 409 U.S. 188, 198, 34 L. Ed. 2d 401, 93 S. Ct. 375 [1972]).

The Kansas Supreme Court has adopted a two-fold analysis for eyewitness identifications. See *State v. Skelton*, 247 Kan. 34, 39-40, 795 P.2d 349 (1990). First, a court should determine whether the procedure used to elicit the identification was unnecessarily suggestive. Second, if the court determines that the procedure was unnecessarily suggestive, an appellate court must consider whether the suggestive nature of the procedure led to a substantial likeli-

hood of irreparable misidentification of the perpetrator, under the totality of the circumstances.

To aid in the assessment of the reliability of pretrial identifications, the United States Supreme Court devised five factors which are to be considered by the court:

"[T]he opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Biggers*, 409 U.S. at 199-200.

Here, arguably, the investigation photos depicting the crime scene, as well as the police reports articulating the suspected course of events, might suggest some details of the crime. However, since Finney's testimony inevitably implicated himself in the circumstances surrounding the murder, if not in the murder itself, the likelihood of misidentification was negligible. At the time of his statements, Finney was not offered immunity from prosecution. Rather, Finney's statements assisted the prosecution in convicting Finney of attempted theft.

Finney's admitted involvement with Shumway on the night the crime was committed afforded Finney the opportunity to observe him and pay attention to particulars with respect to the commission of the crime. Furthermore, when Finney eventually admitted his involvement, he did not hesitate to identify Shumway in the commission of the crime. Finney's testimony provided a foundation from which the court could conclude that Finney had observed Shumway's attack upon Mitch Davis.

Finney's knowledge of the crime may have been related to his greater complicity, and his statement may have been merely an attempt to avoid justice by blaming the entire episode upon Shumway. However, Shumway did not accuse Finney of greater complicity in the crime but, rather, claimed no part in the crime. Shumway's denial had no effect upon the relative admissibility of Finney's testimony, and the jury was entitled to adopt the version of the facts it deemed most credible.

Understanding the suspect nature of accomplice confessions, the Kansas Supreme Court has held that the State must either provide

evidence to fully corroborate the testimony of the accomplice or the district court must provide a cautionary instruction. See *State v. Moody*, 223 Kan. 699, 702, 576 P.2d 637, *cert. denied* 439 U.S. 894 (1978). Here, Finney's statements were partially corroborated by the testimony of Radford, Powers, and Lutz. Moreover, the court provided the jury with a cautionary instruction concerning accomplice testimony.

Shumway misapplies the holding of *Lee v. Illinois*, 476 U.S. 530, 539, 90 L. Ed. 2d 514, 106 S. Ct. 2056 (1986). *Lee* involved the use of an accomplice's statement when the defendant was not provided an opportunity to cross-examine the witness. As Finney testified at trial and was subject to cross-examination, Shumway was not denied the right to confront the witnesses against him. *Lee* is inapplicable, and Finney's statements were properly admitted for evaluation by the jury.

As the court did not err in admitting the statements of John Finney, the statements of Mary Finney, which were based upon John Finney's version of the events, were not tainted and were also properly admitted. Again, Shumway was provided an opportunity to explore the foundations of Mary Finney's testimony to demonstrate any inconsistencies or bias contained therein.

## MURDER IN THE SECOND DEGREE

Shumway also complains that the district court improperly instructed the jury on second-degree murder. He alleges three reasons for the instruction's impropriety. First, he claims that the instruction on second-degree murder as a lesser included offense of felony murder provided him with no notice of the State's intent to seek an intentional homicide charge, as opposed to the felony-murder charge, which may be supported by either an intentional or a reckless act. Consequently, Shumway claims he was deprived of his due process right to defend against the second-degree murder charge.

K.S.A. 1999 Supp. 21-3107(2) provides:

"Upon prosecution for a crime, the defendant may be convicted of either the crime charged or a lesser included crime, but not both. A lesser included crime is:

(a) A lesser degree of the same crime;
(b) a crime where all elements of the lesser crime are identical to some of the elements of the crime charged;
(c) an attempt to commit the crime charged; or
(d) an attempt to commit a crime defined under subsection (2)(a) or (2)(b)."

As the statute clearly permits a conviction of a lesser included crime for which Shumway was not originally charged, this court must initially consider his claim that second-degree murder was not a lesser included crime of felony murder under the statutory scheme implemented at the time the offense was committed.

### A. Second-Degree Murder as a Lesser Included Offense of Felony Murder.

The primary thrust of Shumway's argument revolves around a construction of the first-degree murder statute, K.S.A. 21-3401. Relying upon *State v. Vontress*, 266 Kan. 248, 262, 970 P.2d 42 (1998), in which the Kansas Supreme Court concluded that premeditated first-degree murder and felony murder were separate and distinct offenses, Shumway contends that no strict identity of elements between intentional second-degree murder and first-degree felony murder exists. Felony murder may be supported by either a negligent or an intentional homicide, whereas second-degree murder, as instructed in this case, requires that the killing be intentional.

While it is clear that a comparison of felony murder and intentional second-degree murder demonstrates an absence of equivalent elements, a crime may be a lesser included offense not only when there is an identity of elements but also when one crime is a lesser degree of the other. K.S.A. 1999 Supp. 21-3107(2)(a). While the Kansas Supreme Court has declared felony murder to be a separate and distinct offense from premeditated murder, both offenses are classified as first-degree murder. K.S.A. 21-3401.

Intentional and unintentional second-degree murder are lesser degrees of the crime of first-degree murder and, therefore, second-degree murder is properly a lesser included offense of first-degree murder, whether premeditated murder or felony murder. See *State v. Pierce*, 260 Kan. 859, 864, 927 P.2d 929 (1996).

Chief Justice McFarland recently, in a dissenting opinion, explained the correlation of the homicide statutes in relation to K.S.A. 21-3107(2)(a), in the following manner:

"(2)(a) A lesser degree of the same crime: The most common of degree crimes are the four homicide statutes: murder in the first degree, K.S.A. 21-3401; murder in the second degree, K.S.A. 21-3402; voluntary manslaughter, K.S.A. 21-3403; and involuntary manslaughter, K.S.A. 21-3404. The only element they have in common is a dead person for whose death the defendant is culpable. The degrees of homicide do not build upon each other. For example, involuntary manslaughter is a reckless unintentional killing under certain specified circumstances and is not a crime necessarily proven in a higher degree of homicide. By including degrees of the same offense in the definition of *included* crimes, a defendant cannot be convicted of two degrees of homicide for one death. This is not an elements test— rather (2)(a) states different degrees of a crime are *included* crimes." *State v. Garcia*, 272 Kan. 140, 150, 32 P.3d 188 (2001) (McFarland, C.J., dissenting).

Because second-degree murder is statutorily defined as a lesser included offense of first-degree murder, the defendant may properly be convicted of second-degree murder even though he was not originally charged with the offense.

### B. Factual Basis for Requested Instruction.

Shumway also contends that the evidence strongly supported the charge of felony murder and, therefore, the instruction on second-degree murder should not have been given. The Kansas Supreme Court has determined that the failure to instruct the jury on lesser included offenses for felony murder is not error unless the State's evidence supporting a conviction on the underlying felony was weak or inconclusive. See *State v. Sandifer*, 270 Kan. 591, 597-98, 17 P.3d 921 (2001).

In every case cited by Shumway, except *State v. Bradford*, 219 Kan. 336, 548 P.2d 812 (1976), the appellate court has been faced with a district court's denial of a defendant's request for a lesser included instruction, rather than the district court's instruction on a lesser included offense at the request of the State in opposition to the will of the defendant. Here, Shumway presents the anomalous position that instructing the jury on the lesser included offense of second-degree murder was erroneous, while the State ba-

sically argues its evidence concerning the underlying felony might have been perceived as weak or inconclusive by the jury.

"Ordinarily, in a felony-murder case, where the evidence of the commission of the felony is clear and uncontroverted, no instruction on lesser degrees of homicide should be given. But where, as here, there is conflicting evidence as to the commission of the felony, and where the evidence will support a conviction of a lesser degree of homicide, instructions on appropriate lesser degrees should be given." *Bradford*, 219 Kan. at 343.

Here, the prosecution's theory of the case supposed that Shumway killed the victim in an attempt to rob the victim of his credit cards, money, or other personal valuables. The only evidence supporting this theory was Shumway's admissions, reported through Finney. John Finney testified that he witnessed Shumway rifling through the victim's pockets after hitting the victim with the 2x4 board. Finney also testified that Shumway reported he had taken some money and credit cards from the victim and had placed them with the murder weapon under a bush.

Alternatively, Finney admitted he never witnessed Shumway taking anything from the victim. Moreover, the State never recovered credit cards or money belonging to the victim, even though the board was found under a bush near the crime scene.

Consequently, while the State provided evidence of an aggravated robbery, the evidence was far from overwhelming. Based upon the lack of physical evidence and direct testimony related to the aggravated robbery, it was entirely possible that the jury believed the State had failed to prove the underlying felony of aggravated robbery. The jury likely believed that Shumway committed the murder yet doubted whether Shumway's motive was robbery.

The evidence supported an instruction on second-degree murder. We need not evaluate the strength of the State's case concerning the underlying felony. The jury's finding of not guilty on the aggravated robbery charge demonstrated that the State's evidence on that charge was not sufficient to carry the burden of proof in a criminal prosecution.

Irrespective of the jury's verdict, however, the premise that a court is not required to instruct on lesser included offenses of felony murder unless the underlying felony is weak or inconclusive

does not necessarily support the corollary of that proposition—that the court necessarily errs in instructing a jury on lesser included offenses where the evidence of the underlying felony is not weak or inconclusive.

The applicable standard of review of a district court's instructions is whether the instructions, read as a whole, properly and fairly state the applicable law and whether a jury could have been confused or misled by the instructions. If not, the instructions, even if erroneous in some small way, do not constitute reversible error. See *State v. Mims*, 264 Kan. 506, 514, 956 P.2d 1337 (1998).

There is no question that the law articulated by the district court's instructions properly and fairly stated the law applicable to the facts of this case. Thus, the district court committed no error in instructing the jury on second-degree murder as a lesser included offense of felony murder over Shumway's objection.

### C. Due Process Violation.

Turning to the consideration of Shumways primary argument, this court essentially must consider whether the State's requested lesser included instruction on second-degree murder violated Shumway's due process rights by failing to give him notice of a charged offense.

Shumway relies upon *State v. Thompkins*, 263 Kan. 602, 952 P.2d 1332 (1998), *superceded, in part, by statute*, see *Vontress*, 266 Kan. at 262-64. In *Thompkins*, the Kansas Supreme Court reversed a conviction for first-degree premeditated murder on the basis that the State improperly sought an instruction on premeditated murder during trial after the premeditated murder count had been dismissed from the complaint at the preliminary hearing and the State failed to implement procedural remedies to reinstate the premeditated murder charge. 263 Kan. at 619-21.

"The charging document is the jurisdictional instrument which gives the court authority to convict a defendant of crimes charged in the complaint or of the lesser included crimes thereof. Conversely, if a crime is not specifically stated in the information or is not a lesser included offense of the crime charged, the district court lacks jurisdiction to convict a defendant of the crime, regardless of the evidence presented." *State v. Horn*, 20 Kan. App. 2d 689, 692, 892 P.2d 513, *rev.*

*denied* 257 Kan. 1094 (1995) (citing *State v. Chatmon*, 234 Kan. 197, 204-05, 671 P.2d 531 [1983]).

In this case, the State lawfully proceeded to trial on the felony-murder charge. At the close of its case, the State sought to have the district court instruct on a lesser included offense. Unlike *Thompkins*, *Chatmon*, or *Horn*, the requested instruction in the present case involved a lesser included offense of the charged offense. If a district court possesses jurisdiction over an offense charged in a complaint, it equally possesses jurisdiction to convict the defendant of a lesser included offense. See *Horn*, 20 Kan. App. 2d at 693 (analyzing *State v. Patterson*, 12 Kan. App. 2d 731, 754 P.2d 1207 [1988], in light of *State v. Gibson*, 246 Kan. 298, 787 P.2d 1176 [1990], which concluded that sexual battery was not a lesser included offense of rape).

Since the district court properly exercised jurisdiction over the offense for which Shumway was convicted, the only constitutional argument remaining to Shumway concerns a lack of notice to defend. Based upon Shumway's arguments at trial, however, there was no indication that any lack of notice prejudiced him in any manner. His theory of the crime involved pointing to another suspect and denying his own involvement. It is unclear how this defense would have differed if the State had originally charged Shumway with second-degree murder as an alternative to felony murder.

Even trial errors of constitutional magnitude may be deemed harmless if an appellate court is prepared to declare that the error had little, if any, likelihood of having changed the result of the trial. See *State v. Fulton*, 269 Kan. 835, 845, 9 P.3d 18 (2000). Any error related solely to Shumway's lack of notice concerning an instruction on second-degree murder was harmless to the extent that no additional evidence was presented and neither Shumway's nor the prosecution's theories of the case were prejudiced due to the jury's consideration of the instruction on second-degree murder.

## THE SENTENCE

Shumway's final argument relates to the sentencing scheme in place at the time of his conviction. According to Shumway, his sentences violate the Eighth Amendment to the United States

Constitution because his sentence for intentional second-degree murder does not allow him early release for good time credits until he has served over 43 years of his 51-year, 8-month sentence. See K.S.A. 1999 Supp. 21-4704(a) and K.S.A. 1999 Supp. 21-4706. In contrast, he argues that a person who committed the crime of first-degree felony murder in 1999 would be parole eligible in 20 years. See K.S.A. 1999 Supp. 22-3717(b)(2) and K.S.A. 1999 Supp. 21-4706.

As the sentencing court did not impose a departure sentence, this court has no jurisdiction to consider Shumway's claim in a direct appeal. Consequently, this issue is dismissed for lack of jurisdiction. See *State v. Lewis*, 27 Kan. App. 2d 134, 140, 998 P.2d 1141, *rev. denied* 269 Kan. 938 (2000).

Affirmed.