No. 91,651

STATE OF KANSAS, *Appellee*, v. JOHN KEITH CALVIN, *Appellant*.

105 P.3d 710

Opinion filed February 18, 2005.

*Michael Redmon*, of Kansas City, argued the cause and was on the brief for appellant.

*John J. Bryant*, assistant district attorney, argued the cause, and *Robbin L. Wasson*, assistant district attorney, and *Phill Kline*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

DAVIS, J.: John Keith Calvin appeals his convictions of felony first-degree murder and attempted robbery. He contends insufficient evidence supported his felony-murder conviction, the information was fatally defective, and several instructional errors require reversal of his convictions. Our review fails to disclose reversible error and we affirm.

John Coates died of multiple gunshot wounds outside his residence in Kansas City, Kansas. At the time he was killed he was a drug dealer and was living with his younger brother, Leslie Mark Coates. Leslie testified that someone knocked on the back door around 9 p.m., which was the normal procedure when the victim sold drugs. Leslie let the man inside, recognizing him as the defendant because he was a customer of the victim's and had been at the house at least 20 times. The defendant tried to sell the victim CDs, the victim said he did not want them, and Leslie left the kitchen and went into another room while they continued talking.

About a minute later, Leslie heard shots, grabbed a pistol from under his bed, and ran to the kitchen, but the victim was not there. The door was not shut all the way so he went outside and saw his brother lying on the ground. Leslie saw two men run from behind a tree toward a car parked on a street behind the victim's backyard. He shot at them a few times before they got into the back seat of the car, with the driver waiting inside. Leslie identified one of the individuals running from the house and getting into the car as the defendant.

A neighbor named Wally hollered out, "Who is that in the back yard?" Leslie told Wally to come over and asked him to call an ambulance. Leslie left the residence before the police arrived, intending to hide his gun with the victim's son, Adrian Coates; however, Adrian was not home. He returned to Adrian's residence around 3 a.m. and hid the gun. Adrian subsequently convinced Leslie to turn the gun over to the police.

Another neighbor testified that she heard an apparent argument between two men and then heard two sets of gunshots. She could not identify the silhouette she saw running through the yard because it was pitch black and the person was wearing dark clothes. She heard someone from the victim's residence yelling at someone who had run out into a field, and she heard a response. Someone drove away from the victim's residence at a high rate of speed before the police arrived.

Three suspects were developed during the homicide investigation, the defendant; Melvin Lee White, a.k.a. "Snooky" or "Snake Eyes," and Benjamin Russell. Leslie was not aware of any problems

between the defendant and his brother; however, Leslie, Adrian, and Christina Burton told the police that White and the victim had a bad relationship. White had robbed and pistol-whipped the victim on a prior occasion and had threatened the victim as recently as 4 days before the murder. Adrian testified that White had left threatening messages on the victim's answering machine and had stalked the victim. Adrian also testified that White and the victim had dated the same woman and White was jealous of the victim's successful business. Adrian had heard that White was saying he was going to kill the victim. White's alibi did not check out.

Russell was a 17-year-old friend of White's stepson and he testified at trial pursuant to a plea agreement. Around 8 p.m. on the night of the incident, Russell ran into White and the defendant at a gas station. White gave Russell $20 to drive White and the defendant to someone's house. Russell parked on a street behind the house, and the defendant got in the back seat with White and discussed White's plan to rob someone. The defendant agreed to try to sell CDs in an effort to get inside the home because they knew that the victim would not let White in. They discussed who was going to carry the gun before they got out of the car, climbed the fence, and walked toward the house. Russell told officers that he got out of the car and watched the incident from the fence, but at trial he claimed that he remained in the car. Russell told White that if White gave him more money, Russell would take White home after White and the defendant went their separate ways.

Russell watched White hide by the side of the house while the defendant went inside. After 5 to 10 minutes, White grabbed the victim when he walked out the door with the defendant. The defendant stood watching as White and the victim wrestled, grabbed each other, yelled, and fell to the ground to the sound of gunshots. Russell told police that the defendant then ran away between the houses. Russell claimed that he drove away after he heard the gunshots and that no one came back and got into his car.

The defendant's sister, Gloria Calvin, lived a block from the victim's residence. She testified that the defendant came to her house between 9 and 10 p.m. and said someone was shooting on the other street. She said the defendant was out of breath as if he had been

running. When hearing sirens, the defendant and Gloria drove to another sister's house who lived on the same street as the victim, to see what was happening. Gloria went into her sister's house and did not see the defendant again that evening.

The Kansas Bureau of Investigation firearm and tool mark examiner testified that three of the .25 caliber auto bullets recovered from the victim's body were identified as being fired from the same firearm; however, she could not conclusively say that the fourth bullet which was also a .25 caliber auto came from the same weapon. Six .25 caliber shell casings recovered from the scene were tested. Testing showed that two of the casings were fired from the same firearm, another two were fired from another firearm, and the other two were inconclusive. Tests were inconclusive as to whether the one spent .38 caliber shell casing found at the scene was fired by the .380 caliber Locin handgun used by Leslie Coates, which was recovered at Adrian's residence.

The defendant did not testify at trial or present any witnesses. In an interview with police, defendant denied involvement with the crime. However, 3 days later he made two more statements, which were videotaped and played at trial. The transcripts of these statements are contained in the record on appeal.

In the first statement, the defendant denied any knowledge of the robbery. He said that White came to his house with his nephew, later identified as Russell, and gave him several CDs. The defendant went to the victim's house to sell the CDs and he guessed that White had followed him, but he did not see him. He said that when he opened the door to leave, Russell came into the house with a gun. The victim tried to push Russell out, they struggled, they ended up on the ground with the victim on top, and shots were fired. The defendant ran to his sister's house fearing he would be shot because Russell was following after him. He denied knowing White and Russell were going to rob the victim.

During the defendant's later interview, officers made it very clear that they did not believe the defendant's version of events. The videotape was turned off and the officers continued to point out the inconsistencies in the defendant's statement. About 15 minutes later, the defendant said he wanted to tell the truth and

they turned the videotape back on. The defendant admitted that White asked him to sell the CDs to get the door open for Russell to rob the victim. White said the defendant could keep the money he made from the CDs. The defendant maintained that he walked to the victim's house, Russell pointed the gun at the victim when he tried to get through the door, and the defendant took off running when he heard the gunshots.

In opening and closing argument, the theory of defense was that the defendant was not aware that a robbery was going to take place, he was used by White and Russell to at least rob the victim, he was innocently at the victim's house selling CDs, and the officers coerced him into making the incriminating second statement.

The defendant was convicted of felony first-degree murder and attempted robbery. The defendant's alternative motions for judgment of acquittal notwithstanding the verdict and motion for new trial were denied. He was sentenced to life imprisonment with the possibility of parole after 20 years.

## A. SUFFICIENCY OF EVIDENCE

"When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt." *State v. Beach*, 275 Kan. 603, Syl. ¶ 2, 67 P.3d 121 (2003).

The amended information charged the defendant with felony murder committed by "unlawfully and feloniously, in the perpetration, attempt to perpetrate, or flight from an inherently dangerous felony, to wit: Robbery, kill a human being, to wit: John Coates." Count II charged the defendant with attempted robbery by: "unlawfully, feloniously, knowingly and willfully commit[ting] an overt act to-wit: distracted one John Coates in order to facilitate a robbery, toward the perpetration of the crime of robbery . . . with the intent to commit said crime, but failed or was prevented or intercepted in the execution of said crime."

The defendant argues that insufficient evidence supported his conviction of felony murder based upon the underlying crime of robbery. He reasons that no evidence was presented that an actual

robbery took place, such as a demand for money, property, or drugs; testimony that any property was taken by force or threat from the victim; or testimony that any property was missing from the house or the victim. He contends the mere discussion of a robbery was insufficient to establish the underlying felony of robbery.

The defendant further argues that although he was convicted of attempted robbery, that was not alleged as the underlying felony. He argues the terms "in the commission of," "attempt to commit," and "flight from," used in the felony-murder statute, are temporal requirements delineating when a killing may occur and still be part of the underlying felony. See *State v. Kleypas*, 272 Kan. 894, 938, 40 P.3d 139 (2002). He contends it is possible the jury could have believed that he committed an overt act towards the commission of a robbery and was attempting to commit a robbery by going into the victim's home, but since no robbery actually occurred, there was no underlying felony, making it impossible for him to be found guilty of felony murder.

The State counters that no evidence of a robbery actually taking place was presented or required because the underlying felony was really *attempted* robbery. It points to language in the felony-murder statute that the killing may occur during an "attempt to commit" an inherently dangerous felony. K.S.A. 21-3401(b). The State argues that the murder interfered with the completion of the underlying felony of robbery. We agree.

Felony murder is the killing of a human being in the commission of, attempt to commit, or flight from an inherently dangerous felony as defined in K.S.A. 2003 Supp. 21-3436. K.S.A. 21-3401(b). "Robbery is the taking of property from the person or presence of another by force or by threat of bodily harm to any person." K.S.A. 21-3426. "An attempt is any overt act toward the perpetration of a crime done by a person who intends to commit such crime but fails in the perpetration thereof or is prevented or intercepted in executing such crime." K.S.A. 21-3301(a).

An overt act cannot be defined by applying a set of definitive rules; rather, each case must be decided based on the unique facts presented and the inferences which might reasonably be drawn

from those facts. *State v. Salcido-Corral*, 262 Kan. 392, 398, 940 P.2d 11 (1997). "In order to prove the defendant attempted an underlying felony (and thereby committed felony murder), the State must show that the defendant took a step beyond mere preparation so that some appreciable fragment of the underlying crime was committed." 262 Kan. at 398.

Under the facts of this case, the defendant is correct that insufficient facts were presented that a robbery was completed, as no evidence was presented that White, Russell, or the defendant intentionally took any property from the victim or that any property was missing from the victim's residence. However, the State is also correct in pointing out that felony murder is supported if the killing was committed during "an attempt to commit" the robbery. See K.S.A. 21-3401(b). A robbery does not need to be completed in order to support the attempt for the purposes of K.S.A. 21-3401(b). *State v. Bradford*, 254 Kan. 133, 140, 864 P.2d 680 (1993). Moreover, the element of attempt to commit an underlying felony may be proven by circumstantial evidence so long as the jury could draw from the evidence a reasonable inference of guilt. *State v. Sanford*, 237 Kan. 312, 317, 699 P.2d 506 (1985).

The question becomes whether the noncriminal act by the defendant of selling CDs to the defendant was a sufficient overt act toward the perpetration of a robbery. The defendant's action in selling the CDs to the victim was not in and of itself an element of the crime of robbery. However, evidence was presented that the defendant gained access to the victim's home with the intent of getting the door open for one of the codefendants so he could rob the victim. The defendant's efforts to aid and abet the robbery were prevented or intercepted when, according to the defendant, Russell pointed a gun at the victim, struggled with him, and the victim was shot.

An appreciable fragment of the crime was proven by the defendant's statement that when he got the victim to open the door, Russell pointed the gun at the victim while trying to force his way inside of the home (threat of bodily harm). The inference that Russell was intending to rob the victim is certainly reasonable based upon the evidence of White and the defendant's plan to

commit the robbery in this manner with the use of a gun. Viewing the evidence in the light most favorable to the State, sufficient evidence was presented that the killing happened during the attempt to commit the underlying felony of robbery.

## B. A LESSER INCLUDED OFFENSE

When discussing jury instructions at trial, both parties agreed with the following erroneous statement made by the district court: "There is no lesser included offense I don't believe of felony murder and I don't think that there's any evidence that this was a premeditated murder or anything of that nature, which would require an instruction on second degree or voluntary or anything of that nature."

On appeal, the defendant argues the district court erred in failing to instruct the jury on second-degree murder as a lesser included offense of felony murder.

"When murder is committed during the commission of a felony, the rule requiring instructions on lesser included offenses does not apply. The felonious conduct is held tantamount to the elements of deliberation and premeditation which are otherwise required for first-degree murder. It is only when the evidence of the underlying felony is weak, inconclusive, or conflicting that instructions on lesser included offenses may be required." *State v. Boone*, 277 Kan. 208, Syl. ¶ 6, 83 P.3d 195 (2004).

As demonstrated in the first issue, evidence that the victim was killed during an attempt to commit the underlying felony was sufficient to support the conviction, and thus was not weak, inconclusive, or conflicting. As such, no lesser included offense instructions were required to be given. However, even if we were to conclude otherwise, the defendant has not demonstrated that the district court's failure to instruct the jury on second-degree murder was clearly erroneous.

"No party may assign as error the giving or failure to give an instruction, including a lesser included crime instruction, unless the party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which the party objects and the grounds of the objection unless the instruction or the failure to give an instruction is clearly erroneous. The failure to give an instruction is clearly erroneous only if the reviewing court reaches a firm conviction that absent

the alleged error there was a real possibility the jury would have returned a different verdict." *Boone*, 277 Kan. 208, Syl. ¶ 8.

Second-degree murder is a lesser included offense of felony murder. *State v. Sandifer*, 270 Kan. 591, 597-98, 17 P.3d 921 (2001). "Murder in the second degree is the killing of a human being committed: (a) Intentionally; or (b) unintentionally but recklessly under circumstances manifesting extreme indifference to the value of human life." K.S.A. 2003 Supp. 21-3402.

The defendant argues that the jury should have been instructed on intentional second-degree murder based on evidence that White and the victim had a bad relationship which involved White threatening the victim. The defendant contends it is possible that White was thinking of committing robbery but changed his mind and decided to kill the victim. As the evidence of the robbery was weak, he contends that the jury could have doubted that the motive for the murder was robbery. See *State v. Shumway*, 30 Kan. App. 2d 836, 848, 50 P.3d 89, *rev. denied* 274 Kan. 1117 (2002) (district court properly instructed on second-degree murder in felony-murder case where evidence that witness saw the defendant rifling through the victim's pockets after the beating and claimed the defendant took money and credit cards was far from overwhelming to prove aggravated robbery).

The defendant speculates that had the court instructed on second-degree murder, the issue would have become whether or not he was an aider or abettor, and he would have argued that he did not have the intent to be involved in or participate in a murder because he had no knowledge that a murder was going to be committed. As such, he concludes that a real possibility exists that a different verdict would have been reached.

The defendant's arguments are conflicting and without merit. He contends that he could not have been convicted of second-degree murder based on the evidence presented at trial, yet maintains he was still entitled to a second-degree murder instruction based upon evidence regarding White's relationship with the victim. "An instruction on a lesser included crime, however, is not required if the jury could not reasonably convict the defendant of

the lesser crime based on the evidence presented." *Boone*, 277 Kan. at 220-21.

The defendant rightly acknowledges that no evidence was presented at trial that he aided or abetted the intentional murder of the victim; rather, the only evidence of his involvement in any possible crime related to robbery of the victim. Thus, even if the jury had been so instructed, no real possibility exists that it would have reached a different verdict. The district court's failure to give an unrequested lesser included second-degree murder instruction was not clearly erroneous.

## C. OVERT ACT INSTRUCTION

In this case, the jury was instructed without objection that in order to establish the charge of attempt to commit robbery, the following claims must be proved:

"1. That the defendant performed an overt act, to-wit: distracted one John Coates in order to facilitate a robbery, toward the commission of the crime of Robbery;

"2. That the defendant did so with the intent to commit the crime of Robbery;

"3. That the defendant failed to complete commission of the crime of Robbery; and

"4. That this act occurred on or about the 12th day of December, 2002, in Wyandotte County, Kansas."

The defendant argues the district court's failure to include the following definition of the term "overt act" in the attempted robbery instruction was clearly erroneous:

"An overt act necessarily must extend beyond mere preparations made by the accused and must sufficiently approach consummation of the offense to stand either as the first or subsequent step in a direct movement toward the completed offense. Mere preparation is insufficient to constitute an overt act." PIK Crim. 3d 55.01.

The defendant reasons that without this definition, the jury could have concluded that the conversations the defendant had with the others about robbing the victim or the defendant's entry into the victim's home constituted an overt act, when in fact, both could be considered mere preparations and insufficient to constitute an overt act. The defendant argues that counsel should have been able to make these arguments in front of a jury that was

properly instructed as to what constitutes an attempt and an overt act. This argument is without merit.

As the defendant did not request this instruction, this court reverses only if a real possibility exists that the jury would have rendered a different verdict if the instruction had been given. Moreover, "if the instructions properly and fairly state the law as applied to the facts in the case, and if the jury could not reasonably have been misled by them, then the instructions do not constitute reversible error although they may be in some small way erroneous." *State v. Aikins*, 261 Kan. 346, Syl. ¶ 25, 932 P.2d 408 (1997).

The jury in this case could not have been misled into believing that mere preparations constituted the overt act because the attempted robbery instruction clearly defined what conduct was alleged to be the overt act: "distracted one John Coates in order to facilitate a robbery." While the better practice would have been to include the definition of "overt act" as provided in the pattern instruction, this error was harmless as the instruction properly and fairly stated the law as applied to the facts of this case. See *State v. Kleypas*, 272 Kan. at 940-941 (recommending language that "[m]ere preparation is insufficient to constitute an overt act" be added to the pattern instruction, but finding instruction which omitted the word "overt" and did not define the term was not clearly erroneous). Thus, the court's failure to define overt act was not clearly erroneous.

## D. FELONY-MURDER INSTRUCTION

The defendant argues that the following portion of the felony-murder jury instruction was erroneous because it did not require the jury to find the defendant participated in the underlying felony: "(2) That such killing was done while in the commission of, or the attempt to commit, or in flight from committing or attempting to commit an inherently dangerous felony, to wit: Robbery."

The defendant explains that the jury may have believed that White killed the victim in the act of robbery and convicted the defendant because he was at the scene, even if it believed the defendant's first version of events indicating that he did not know about the robbery. He contends the instruction should have refer-

enced the defendant's participation in the underlying felony: " 'Such killing was done *while defendant and others* committed . . . [r]obbery.' " (Emphasis added.) As the defendant did not request this instruction, the clearly erroneous standard of review is applicable. See *Boone*, 277 Kan. 208, Syl. ¶ 8.

The State argues that when the felony-murder instruction is reviewed in conjunction with the aiding and abetting instruction, the jury instructions as a whole, in light of the evidence and the opposing theories of the case, were not confusing and properly informed the jury of the law as applied to the facts of the case.

Both arguments fail to acknowledge that the defendant was also convicted of the separate crime of attempted robbery. To support that conviction, the jury was instructed that it had to find that the defendant performed the overt act of distracting the victim in order to facilitate the commission of the crime of robbery, that the defendant did so with the intent to commit the crime of robbery, and that the defendant failed to complete commission of the crime of robbery.

The jury could not have found that the defendant went to the house to distract the victim with the intent of committing robbery and also that he did not know about the robbery. Under the facts of this case, no reasonable possibility exists that the jury would have reached a different verdict if this amended instruction had been given. *See Boone*, 277 Kan. 208, Syl. ¶ 8.

## E. REQUESTED CAUTIONARY EYEWITNESS IDENTIFICATION INSTRUCTION

At trial, defense counsel orally requested an eyewitness identification instruction based on Leslie Coates' testimony that he saw the defendant running from the scene and getting into a car. The district court ruled the instruction was unnecessary because Leslie testified that he knew the defendant and had seen him at least 20 times at the victim's house. The defendant appeals this decision and argues the following instruction should have been given:

"The law places the burden upon the State to identify the defendant. The law does not require the defendant to prove (he)(she) has been wrongly identified. In weighing the reliability of eyewitness identification testimony, you first should

determine whether any of the following factors existed and, if so, the extent to which they would affect accuracy of identification by an eyewitness. Factors you may consider are:

"1. The opportunity the witness had to observe. This includes any physical condition which could affect the ability of the witness to observe, the length of the time of observation, and any limitations on observation like an obstruction or poor lighting;

"2. The emotional state of the witness at the time including that which might be caused by the use of a weapon or a threat of violence;

"3. Whether the witness had observed the defendant(s) on earlier occasions;

"4. Whether a significant amount of time elapsed between the crime charged and any later identification;

"5. Whether the witness ever failed to identify the defendant(s) or made any inconsistent identification;

"6. The degree of certainty demonstrated by the witness at the time of any identification of the accused; and

"7. Whether there are any other circumstances that may have affected the accuracy of the eyewitness identification." PIK Crim. 3d 52.20.

"In any criminal action in which eyewitness identification is a critical part of the prosecution's case and there is serious question about the reliability of the identification, a cautionary instruction should be given advising the jury as to the factors to be considered in weighing the credibility of the eyewitness identification testimony." *State v. Mann*, 274 Kan. 670, Syl. ¶ 1, 56 P.3d 212 (2002).

"The reliability of the identification and the credibility of an eyewitness are not the same thing." 274 Kan. at 679.

However, the factors set out in PIK Crim. 3d 52.20 contemplate an eyewitness who does not know the defendant personally. See *State v. Saenz*, 271 Kan. 339, 354, 22 P.3d 151 (2001). "Where the witness personally knows the individual being identified, the cautionary eyewitness identification instruction is not necessary and the accuracy of the identification can be sufficiently challenged through cross-examination." *Mann*, 274 Kan. 670, Syl. ¶ 2.

The defendant argues that *Mann* and its predecessor cases should be overruled because it is illogical to conclude that because an eyewitness knows someone, they cannot make a mistake in an identification of that person. He points to evidence that the witness was in an extreme emotional state, that his opportunity to observe the individuals was limited because of the darkness and the movement of the individuals, that Russell claimed he drove away alone, and that the defendant's sister verified that he came to her house

after the incident. He argues it was possible the two men that Leslie saw running were Russell and White.

As the evidence cited by the defendant on appeal to challenge the accuracy of the identification was brought to the jury's attention at trial, the defendant has not shown how the failure to give the cautionary eyewitness instruction has prejudiced him. Even if Leslie was mistaken and saw Russell and White getting into the car, the defendant has maintained that he went to the victim's house to sell CDs and that he ran from the scene when he heard gunshots. The only disputed fact was whether he got into the car presumably driven by Russell. The principal issue was not whether the defendant got into the car, but whether he was aware that a robbery was going to take place. The defendant has failed to demonstrate that *Mann* should be overruled under the facts of his case.

## F. FATALLY DEFECTIVE INFORMATION

The defendant argues the amended information in this case was fatally defective. He argues it was not properly verified because: (1) it stated that the district attorney had read and verified the contents but it was signed by a different assistant district attorney; and (2) the clerk of the district court's signature as notary was file-stamped and signed by another individual whose title was not identified.

The defendant acknowledges this issue was not raised below and contends the standard of review is governed by *State v. Hall*, 246 Kan. 728, 765, 793 P.2d 737 (1990), *overruled in part on other grounds Ferguson v. State*, 276 Kan. 428, 78 P.3d 40 (2003). The State argues that the defendant has waived this issue by failing to object to the amended information at the district court level, under *State v. Fraker*, 242 Kan. 466, 748 P.2d 868 (1988). The State's argument is correct.

K.S.A. 22-3208(3) provides:

"Defenses and objections based on defects in the institution of the prosecution or in the complaint, information or indictment other than that it fails to show jurisdiction in the court or to charge a crime may be raised only by motion before trial. The motion shall include all such defenses and objections then available to the defendant. Failure to present any such defense or objection as herein provided constitutes a waiver thereof, but the court for cause shown may grant relief from

the waiver. Lack of jurisdiction or the failure of the complaint, information or indictment to charge a crime shall be noticed by the court at any time during the pendency of the proceeding."

In *State v. Graham,* 247 Kan. 388, 395, 799 P.2d 1003 (1990), this court found that the defendant's objection to the unverified complaint after the jury was sworn was untimely and did not deprive the court of jurisdiction to proceed with the trial. Citing *Fraker,* the court reasoned that the lack of verification on the complaint is not a defect that deprives the court of jurisdiction, a verification defect could be waived, and the right to challenge the verification can be lost through inaction. 247 Kan. at 394.

In this case, the defendant failed to comply with K.S.A. 22-3208(3) by objecting to the verification defect prior to trial. As such, he has waived his right to raise this issue on appeal.

Affirmed.