No. 90,912

STATE OF KANSAS, *Appellee*, v. MARSHALL J. GREEN, a/k/a MARSHALL J. GREEN, JR., *Appellant*.

(127 P.3d 241)

Opinion filed February 3, 2006.

*Chris A. Garcia*, of Wichita, argued the cause and was on the brief for appellant.

*Kristi L. Barton*, assistant district attorney, argued the cause, and *Nola Foulston*, district attorney, and *Phill Kline*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

LOCKETT, J.: The State appeals the Court of Appeals' reversal of Green's conviction for voluntary manslaughter based on the majority of the panel's conclusion that the evidence was insufficient to support Green's conviction for voluntary manslaughter as an aider and abetter.

In the early morning hours of June 29, 2002, O.T. Ruffin died after a fight in the parking lot of Harry and Ollie's bar in Wichita. The events leading up to O.T.'s death began when O.T. bumped into Green's sister, Latrina Green, on the bar's dance floor. Latrina was upset and started arguing with O.T. Latrina's boyfriend, Derrick Henderson, became involved and commenced arguing with O.T. O.T.'s brother, Patrick, stepped in front of O.T., told Henderson that they were not looking for trouble, and attempted to calm Henderson. Henderson would not calm down. A group of Henderson's friends began crowding behind Henderson. Latrina's brother, Marshall Green, was one of the individuals that joined Henderson.

O.T. and Patrick were each about 5 feet, 6 inches or 5 feet, 7 inches tall and weighed 170 to 180 pounds. Patrick estimated Henderson's height at approximately 6 feet, 3 inches and his weight at about 220 to 230 pounds. Concerned about Henderson's relative size and afraid that the group was going to jump them, Patrick stated to O.T. that it was time to leave. Patrick then grabbed the front of O.T.'s shirt and commenced pushing O.T. backwards through the bar toward the door. Patrick kept himself between Henderson and O.T. The crowd led by Henderson and Green followed O.T. and Patrick to the bar's front door. When Patrick and O.T. reached the front door of the bar, O.T. stated to the crowd, "I don't want to fight you all."

Green, using both of his fists, responded to O.T.'s statement by shoving O.T. out the door. After being shoved outside the door and into the parking lot, O.T. and Patrick started running towards Patrick's car. Henderson went after O.T., and Green pursued Patrick. A few seconds later, Patrick stopped and looked back. Patrick observed O.T. lying on the ground in the parking lot and several people kicking and stomping on his brother. Patrick testified that

when he attempted to go back to help his brother, Green swung at him and prevented him from helping O.T.

A few minutes after Green pushed O.T. outside, a police officer arrived. The officer had been across the street on a domestic violence call and heard neighbors shouting that there was a fight in the bar's parking lot. The officer observed Henderson jumping up and down on O.T.'s back. Green's sisters became aware of the officer and attempted to pull Henderson off of O.T. Henderson then stepped off O.T. and kicked him one last time before backing away. Green and his girlfriend immediately ran to Green's car and left. The officer arrested Henderson, both of Green's sisters, and others. O.T. was rushed to the hospital. Before surgery could be performed, O.T. died from a lack of oxygen to his brain caused by blunt force trauma to his head and chest.

Green spent the rest of the night with his girlfriend. Green dropped her off at her house about 8 a.m. Officers attempted to contact Green at his last known address at approximately 10 a.m, but could not find him. Green missed an appointment with his parole officer on July 1, 2002, and did not contact his parole officer after that date. Neither Green's sister nor his girlfriend saw Green until after Green was arrested in Los Angeles on December 2, 2002.

After Green was returned to Kansas, he was formally charged with and tried for the second-degree murder of O.T. It is important to note that a jury convicted Green of the lesser included offense of voluntary manslaughter. Green appealed to the Kansas Court of Appeals, arguing that the evidence was insufficient to support his conviction. The Kansas Court of Appeals reversed his conviction. *State v. Green*, No. 90,912, unpublished opinion dated December 10, 2004. This court granted the State's petition for review of the Court of Appeals' decision.

## WAS THE EVIDENCE SUFFICIENT TO SUPPORT A CONVICTION FOR VOLUNTARY MANSLAUGHTER AS AN AIDER AND ABETTER?

The State argued to the Court of Appeals that, based on his participation in the death of O.T. Ruffin, the evidence was suffi-

cient to support Green's conviction for voluntary manslaughter. A majority of the Court of Appeals reversed Green's conviction, concluding that, because he was chasing Patrick, Green was not personally involved in the attack on O.T. The majority of the Court of Appeals further concluded that O.T.'s death was not a reasonably foreseeable consequence of a "bar fight, without weapons or premeditated planning of purposeful life-threatening activity." *Green*, Slip op. at 14.

When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Calvin*, 279 Kan. 193, 198, 105 P.3d 710 (2005). The jury has the prerogative to determine witness credibility, the weight of the evidence, and any reasonable inferences that may be drawn from the evidence. An appellate court does not reweigh the evidence or reevaluate the credibility of witnesses. All issues of credibility are resolved in favor of the State. *State v. Clemons*, 261 Kan. 66, 71, 929 P.2d 749 (1996).

K.S.A. 21-3205 provides:

"(1) A person is criminally responsible for a crime committed by another if such person intentionally aids, abets, advises, hires, counsels or procures the other to commit the crime.

"(2) A person liable under subsection (1) hereof is also liable for any other crime committed in pursuance of the intended crime if reasonably foreseeable by such person as a probable consequence of committing or attempting to commit the crime intended.

"(3) A person liable under this section may be charged with and convicted of the crime although the person alleged to have directly committed the act constituting the crime lacked criminal or legal capacity or has not been convicted or has been acquitted or has been convicted of some other degree of the crime or of some other crime based on the same act."

To establish guilt on the basis of aiding and abetting, the State was required to show that Green knowingly associated with the unlawful venture and participated in such a way as to indicate that he was facilitating the success of the venture. Without other incriminating evidence, mere presence in the vicinity of the crime

or mere association with the principals that committed the crime is not sufficient to establish guilt as an aider and abettor. *State v. Bryant*, 276 Kan. 485, 493, 78 P.3d 462 (2003).

Here, the unlawful venture was the beating that resulted in O.T.'s death. Green asserts that he cannot be convicted as Henderson's aider and abettor simply because he was in the vicinity of the beating and associated with Henderson, who actually beat O.T. Green argues that there is no evidence that he participated in beating O.T. or encouraged Henderson to beat O.T.

A majority of the Court of Appeals accepted Green's argument, concluding that Green was involved in "a bar fight with Patrick, not a sustained attack on O.T." *Green*, slip op. at 14. However, this conclusion overlooks the applicable standard of review, which requires an appellate court to review the evidence in the light most favorable to the State. See *Calvin*, 279 Kan. at 198.

An appellate court does not determine whether the evidence is incompatible with any reasonable hypothesis except guilt. That function remains with the jury and the trial court. Rather, an appellate court is "limited to ascertaining whether there was a basis in the evidence for a reasonable inference of guilt." *State v. Boone*, 277 Kan. 208, 217, 83 P.3d 195 (2004). Regardless of whether the evidence supports another theory of the events, an appellate court's function is to determine whether there is a basis in the evidence to support the jury's guilty verdict. *Boone*, 277 Kan. at 218.

Viewing the evidence in a light most favorable to the State, there is evidence that Green facilitated the success of the criminal venture in two ways. First, Green initiated the attack on O.T by pushing O.T. out of the bar and into the parking lot where the beating occurred. Patrick testified that Green pushed O.T. out the door into the parking lot with his fists after both O.T. and Patrick told Henderson, Green, and their other companions that they did not want a fight. Green was the first person to physically contact O.T. Based on that evidence, it was reasonable for the jury to infer that Green's physical contact encouraged or incited others in the crowd to batter O.T. Second, Green also facilitated O.T.'s beating by preventing Patrick from coming to O.T.'s aid. Green admitted to chasing Patrick. Patrick testified that Green pursued him, swung at him,

and prevented him from returning to help his brother. The Court of Appeals' majority concluded that the evidence did not link Green with O.T.'s beating is in error.

We note that the New Mexico Supreme Court also applied an aiding and abetting theory to a person who prevents another from giving aid. In *State v. Ochoa*, 41 N.M. 589, 72 P.2d 609 (1937), two defendants, Ochoa and Avitia, were convicted of second-degree murder as aiders and abettors to the shooting death of the local sheriff. Ochoa and Avitia were part of a mob that was attempting to free a prisoner from the sheriff. 41 N.M. at 595. The sheriff was returning the prisoner to the jail following a court proceeding. The jail was down the alleyway from the courthouse. A mob of people formed in the alley to prevent the sheriff's passage with the prisoner. 41 N.M. at 593-94. When Sheriff's Deputy Boggess threw a tear gas bomb into the crowd, shooting broke out. 41 N.M. at 594. Ochoa hit another deputy with a hammer. 41 N.M. at 595. Ochoa and Avitia then beat and kicked Deputy Boggess. While Deputy Boggess was on the ground, the sheriff was mortally wounded by gunfire. 41 N.M. at 596. The jury found that Ochoa's and Avitia's actions prevented the sheriff's deputy from coming to the sheriff's aid. The *Ochoa* court upheld defendants' convictions for aiding and abetting. 41 N.M. at 599, 601-02.

The principle in *Ochoa* applies to this case. Green prevented Patrick from coming to O.T.'s aid. When that evidence is viewed in a light most favorable to the State, there is sufficient evidence to support Green's conviction for voluntary manslaughter based on an aiding and abetting theory.

For his second claim, Green argues that O.T.'s death was not a reasonably foreseeable consequence of simple battery. This argument assumes that bar fights are limited to simple battery. The Court of Appeals accepted this argument, concluding that a bar fight is not inherently dangerous. According to the majority of the Court of Appeals, a bar fight without "weapons or premeditated planning of purposeful life-threatening activity" is not per se inherently dangerous. *Green*, slip op. at 14. In reaching this conclusion, the majority of the *Green* court observed that, "[c]onsidering the number of fatal bar brawls which occur annually in this country,

it is curious that none is cited by either party as support for their position and none have yet to be found by the court to help resolve this issue." *Green*, slip op. at 12.

These statements demonstrate the focus of the majority of the Court of Appeals on a "bar brawl," and implies there must be an agreement by both sides to participate in a fight. This focus does not consider the fact that the Ruffin brothers clearly did not want to participate in a fight. Both O.T. and Patrick made their lack of agreement clear by stating that they did not want to fight or become involved in a bar brawl. In addition, there is no evidence that O.T. threw a punch. The majority's focus on a "bar brawl" does not consider O.T.'s status as a victim rather than a participant. O.T. was kicked and stomped on the head by several individuals while he was lying face down in the bar's parking lot. Neither O.T. nor Patrick attempted to fight. Rather, both chose to flee.

The majority agreed with the State that Green was participating in a "venture," *i.e.*, the crowd action against O.T. and Patrick. *Green*, slip op. at 12. Without stating which specific crime or crimes, the majority concluded: "[W]ere Green charged with mob action or general violent behavior, he would undoubtedly be guilty." *Green*, slip op at 12-13.

In his dissent, Judge Malone agreed with the majority that Green was not responsible for O.T. Ruffin's death just because Green was involved in the melee. However, he noted, there were two concrete facts in evidence supporting the prosecution's claim that Green's actions aided Derrek Henderson in the beating death of O.T. "First, Green pushed O.T. out the tavern door into the parking lot at a time when O.T. was telling the crowd he did not want to fight. Second, Green prevented Patrick Ruffin from helping his brother by swinging his fists at Patrick in the parking lot." *Green*, slip op. at D-1. Judge Malone observed that this evidence supported the prosecution's claim that Green intentionally aided Henderson in O.T.'s beating. He noted that Green may not have intended for O.T.'s death to result, but this was a reasonably foreseeable consequence of his actions. Judge Malone concluded the evidence against Green as an aider and abettor was legally sufficient for his culpability in the criminal act to become a jury question and the

judge would have affirmed Green's conviction of voluntary manslaughter.

The *Green* court's general conclusion that bar fights are not inherently dangerous accepts Green's assumption that bar fights only involve simple battery. Besides this oversimplification of the nature of bar fights, Green's argument to this court presumes that conclusion without considering the facts of each case. It is important to note that Kansas law does not support that presumption.

K.S.A. 2004 Supp. 21-3436(b)(6) states that aggravated battery, as defined in K.S.A. 21-3414(a)(1), is an inherently dangerous felony. K.S.A. 21-3414(a)(1) includes any intentional conduct that causes great bodily harm, disfigurement, or death. Kansas courts have defined "great bodily harm" as more than slight, trivial, minor, or moderate harm, that does not include mere bruising, which is likely to be sustained by simple battery. *State v. Moore*, 271 Kan. 416, 419, 23 P.3d 815 (2001). Except for a few specific injuries that have been declared to be great bodily harm as a matter of law, the question of whether an injury constitutes great bodily harm is a question of fact for the jury to decide. 271 Kan. at 419-20 (referring to gunshot wounds, rape, and sodomy). Thus, if a bar fight involves intentional great bodily harm, it is, by definition, an aggravated battery which is an inherently dangerous felony.

The Court of Appeals' broad statement that bar fights are not inherently dangerous is not supported by Kansas law. Depending on the degree of harm involved, there are instances similar to our case, where a bar fight was found to be inherently dangerous. See, e.g., *State v. Maxfield*, 30 Kan. App. 2d 873, 875-76, 54 P.3d 500, *rev. denied* 273 Kan. 1038 (2001) (demonstrating that a defendant may aid and abet a death during a bar fight). The dangerousness of the bar fight is determined by the facts of each case. We therefore conclude it is reasonably foreseeable that any level of harm, ranging from a simple battery to death, can result from a bar fight.

Thus, the facts of each case are evaluated to determine whether a bar fight results in great bodily harm. Because that factual determination is within the province of the jury, an appellate court is limited to reviewing the record for evidence to support the jury's decision. *Boone*, 277 Kan. at 218. Consequently, an appellate court

cannot conclude, as a matter of law, that all bar fights involve only simple battery and are not inherently dangerous.

Though not cited by the parties or the Court of Appeals, a prior Kansas Court of Appeals decision supports the State's proposition that bar fights without weapons or preplanning that cause death will support a conviction for voluntary manslaughter. See, *e.g.*, *Maxfield*, 30 Kan. App. 2d 873 (victim died after being chased, falling to the ground, and being hit and kicked in the head and chest by several men in the parking lot of a bar); see also *State v. Jackson*, 258 Neb. 24, 601 N.W.2d 741 (1999) (victim was killed during a fist fight; Jackson's conviction for manslaughter was upheld even though his friend fought and killed the decedent).

Henderson was jumping up and down on O.T.'s back using his full force. The jumping on and kicking of the victim's head lasted approximately 1 minute. Within that short amount of time, O.T.'s death was assured. O.T. suffered more than slight, trivial, minor, or moderate harm. This beating was not a simple battery, and it invalidated the very basis of Green's argument. Here, the evidence supports the jury's conclusion that O.T.'s death during a bar fight was the reasonably foreseeable consequence of an inherently dangerous felony-aggravated battery. Under the circumstances, the majority of the Court of Appeals erred by concluding that a bar fight is not per se inherently dangerous and O.T.'s death was not a reasonably foreseeable consequence of a bar fight.

The evidence, when viewed in a light most favorable to the State, also supports the State's argument that Green recognized the culpability of his actions regarding O.T.'s death. When the police arrived at the bar, Green immediately ran to his car and left. He did not check on his sisters or Henderson. Green did not simply flee the bar parking lot. After spending the night with his girlfriend, Green left Kansas. Officers began looking for Green at his last known addresses as early as 10 a.m. on the day of O.T.'s murder. Green failed to show up for an appointment with his parole officer a few days after O.T.'s murder and did not contact his parole officer after that date. Green was arrested in Los Angeles, California, in December 2002 and returned to Kansas.

While Green was hiding out in California, two of his sisters, Derrick Henderson, and another individual were charged with and convicted of O.T.'s death. Derrick Henderson was convicted of second-degree murder. Green's sister, Latrina, was also convicted of second-degree murder. Green's other sister, Melissa Stanford, was convicted of voluntary manslaughter, and Green's friend, Edwuan Askew, was also convicted of voluntary manslaughter.

After he was arrested and returned to Kansas, Green was charged with second-degree murder under an aiding and abetting theory. The jury convicted Green of the lesser included offense of voluntary manslaughter. This court's review is limited to examining the evidence in a light most favorable to the State to determine if there is evidentiary support for the jury's verdict. See *Boone*, 277 Kan. at 217. Following that standard, we find that the record supports the jury's verdict. We reverse the Court of Appeals' decision reversing Green's conviction and affirm Green's conviction for voluntary manslaughter.

The decision of the Court of Appeals is reversed, and the judgment of conviction of the district court is affirmed.

LOCKETT, J., Retired, assigned.